ACCEPTED
03-14-00518-CV
4450891
THIRD COURT OF APPEALS
AUSTIN, TEXAS
3/11/2015 9:53:10 AM
JEFFREY D. KYLE
CLERK

NO. 03-14-00518-CV

IN THE COURT OF APPEALS
THIRD DISTRICT OF TEXAS
AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS

3/11/2015 9:53:10 AM

JEFFREY D. KYLE
Clerk

JAMES POE AND SENIOR RETIREMENT PLANNERS, LLC, Appellants

vs.

EDUARDO S. ESPINOSA, IN HIS CAPACITY AS RECEIVER OF
RETIREMENT VALUE, LLC, Appellee

Appeal from the 200th Civil District Court of
Travis County, Texas (Hon. Gisela Triana presiding)

APPELLANTS' BRIEF

Respectfully submitted,

**ALDRICH PLLC**

Scott Lindsey
State Bar No. 24036969
1130 Fort Worth Club Tower
777 Taylor Street
Fort Worth, Texas 76102
Telephone:  817-336-5601
Facsimile:  817-336-5297
slindsey@aldrichpllc.com

**ATTORNEY FOR APPELLANTS**

**APPELLANTS REQUEST ORAL ARGUMENT**

# IDENTITIES OF PARTIES AND COUNSEL

**Appellants:**

James Poe and
Senior Retirement Planners, LLC

**Attorney for Appellants:**

Scott Lindsey
Aldrich PLLC
1130 Fort Worth Club Tower
777 Taylor Street
Fort Worth, Texas 76102
Telephone:  817-336-5601
slindsey@aldrichpllc.com

Trial attorney for Appellants:

Robert L. Wright (retired)
4501 Blue Lake Ct.
Fort Worth, TX 76103

**Appellee:**

Eduardo S. Espinosa, in his
capacity as Receiver of
Retirement Value, LLC

**Attorneys for Appellee:**

John W. Thomas
John R. McConnell
George, Brothers, Kincaid &
Horton, L.L.P.
114 W. Seventh, Suite 1100
Austin, TX 78701-3015
Telephone:  512-495-1400
jthomas@gbkh.com
jmcconnell@gbkh.com

# TABLE OF CONTENTS

I. IDENTITIES OF PARTIES AND COUNSEL ........................................ ii

II. INDEX OF AUTHORITIES ................................................................ v

III. STATEMENT OF THE CASE ......................................................... viii

IV. STATEMENT REGARDING ORAL ARGUMENT ............................ ix

V. ISSUES PRESENTED .................................................................... x

VI. STATEMENT OF FACTS ................................................................ 1

    A. Parties Relevant to this Appeal ...................................... 1

    B. RV's Life Settlement Program and RV's Value......................... 3

    C. Plan of Distribution ......................................................... 5

    D. Espinosa as Litigation Plaintiff........................................ 6

    E. Espinosa Collects Unallocated Settlement Proceeds............... 9

    F. Espinosa's Motion for Summary Judgment Against Poe........... 9

    G. Poe Seeks Credit for Unallocated
        James Settlement Proceeds....................................... 11

    H. Judgment and Appeal..................................................... 11

VII. SUMMARY OF THE ARGUMENT ................................................. 12

VIII. ARGUMENT ................................................................................ 14

**Issue One:** Proper allocation of the one-satisfaction rule required that the trial court grant Appellants a settlement credit for unallocated settlement proceeds of $5.5 million. Because Appellants were found liable for an amount less than the unallocated settlement proceeds, the trial court erred, as a matter of law, by failing to render a take-nothing judgment in Appellants' favor.

    A. Standard of Review .................................................... 14

    B. Applicable Law .......................................................... 14

    C. Applicable Facts ........................................................ 16

    D. Application of Law to Fact .......................................... 19

    E. Espinosa's Trial Court Arguments Missed the Point................ 22

    F. TUFTA Attorney Fee Award and Harmful Error ...................... 29

**Issue Two:** The trial court abused its discretion by overruling Appellants' objections to Espinosa's summary judgment evidence.

 A. Standard of Review ................................................................ 30

 B. Argument .............................................................................. 30

   1. Espinosa's July 29, 2011 Affidavit ................................. 32

   2. Espinosa's May 1, 2013 Affidavit ................................. 35

   3. Burchett May 1, 2013 Affidavit ..................................... 36

   4. Reversible Error ........................................................... 37

**Issue Three:** The trial court erred by rendering summary judgment for Espinosa on his TUFTA claim against Appellants because Espinosa lacked standing and because genuine issues of material fact existed for at least one element of each of Espinosa's TUFTA theories.

 A. Standard of Review ................................................................ 38

 B. Espinosa's Grounds for Summary Judgment under TUFTA ... 38

 C. Espinosa Lacks Standing to Recover Investor Money ............ 39

 D. No Creditor has a Qualifying Claim under TUFTA .................. 41

 E. Insufficient Evidence of Insolvency ........................................ 44

   1. Insolvency ..................................................................... 44

   2. Value of Remaining Assets ........................................... 57

 F. Reasonably Equivalent Value ................................................. 59

 G. Actual Intent ........................................................................... 60

 H. Ponzi Scheme Allegations ..................................................... 62

IX. PRAYER ........................................................................................ 64

X. CERTIFICATE OF COMPLIANCE ................................................. 66

XI. CERTIFICATE OF SERVICE ......................................................... 66

XII. APPELLANTS' APPENDIX ............................................................ 67

# INDEX OF AUTHORITITES

## Cases

1.  *Akin, Gump, Strauss, Hauer and Feld, L.L.P. v. E-Court*,
    No. 03-02-00714-CV, 2003 Tex. App. LEXIS 3966
    (Tex. App.—Austin May 8, 2003, no pet.) (mem. op.) ............... 39, 40

2.  *Austin Nursing Center, Inc. v. Lovato*,
    171 S.W.3d 845 (Tex. 2005) ...................................................... 40

3.  *Buccaneer Homes of Alabama, Inc. v. Pelis*,
    43 S.W.3d 586 (Tex. App.—Houston [1st Dist.]
    2001, no pet.) ...................................................... 15, 19, 22, 23, 28, 29

4.  *Burrow v. Arce*, 997 S.W.2d 229 (Tex. 1998) ........................... 32, 35

5.  *Caldwell v. State*, 95 S.W.3d 563
    (Tex. App.—Houston [1st. Dist.] 2002, no pet.) ................................ 63

6.  *Casso v. Brand*, 776 S.W.2d 551 (Tex. 1989) ................................. 54

7.  *Cohen v. Arthur Anderson, L.L.P.*, 106 S.W.3d 304
    (Tex. App.—Houston [1st Dist.] 2003, no pet.) ......... 14, 15, 16, 22, 28

8.  *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378
    (Tex. 2000) .............................................................. 15, 16, 22, 23, 27

9.  *Dalworth Restoration, Inc. v. Rife-Marshall*,
    433 S.W.3d 773 (Tex. App.—Fort Worth
    2014, pet. dism'd w.o.j.) ............................... 14, 16, 20, 22, 23, 27, 28

10. *Diversicare Gen. Partner, Inc. v. Rubio*,
    185 S.W.3d 842 (Tex. 2005) ...................................................... 38

11. *E.I. du Pont de Nemours & Co. v. Robinson*,
    923 S.W.2d 549 (Tex. 1995) .............................................. 33, 35, 37

12. *Fairfield Fin. Group, Inc. v. Synnott*,
    300 S.W.3d 316 (Tex. App.—Austin 2009, no pet.) ......................... 30

13. *Galle, Inc. v. Pool*, 262 S.W.3d 564
    (Tex. App.—Austin 2008, pet. denied) ........................... 14, 21, 22, 28

14. *Goldstein v. Morrison*, 113 S.W.3d 769
    (Tex. App.—Austin 2003, no pet.) ................................................ 63

15. *Goodyear Tire & Rubber Co. v. Mayes*,
    236 S.W.3d 754 (Tex. 2007) ...................................................... 38

16. *Goose Creek Consol. Indep. Sch. Dist. of Chambers v. Jarrar's Plumbing*, 74 S.W.3d 486 (Tex. App.—Texarkana 2002, pet. denied) ............................................................. 23, 25, 26, 27

17. *Gutierrez v. Cayman Is. Firm of Delloitte & Touche*, 100 S.W.3d 261 (Tex. App.—San Antonio 2002, no pet.) ................ 63

18. *Huckabee v. Time Warner Entertainment Co. L.P.*, 19 S.W.3d 413 (Tex. 2000) ......................................................... 54

19. *Manaham v. Meyer*, 862 S.W.2d 130 (Tex. App.—Houston [1st Dist.] 1993, writ denied) ........................... 40

20. *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917 (Tex. 1998) ......................................... 15, 16, 19, 20

21. *Neely v. Comm'n for Lawyer Discipline*, 302 S.W.3d 331 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) ........................ 30

22. *Nixon v. Mr. Prop. Mgmt.*, 690 S.W.2d 546 (Tex.1985) ..................... 38

23. *Osborne v. Jauregui, Inc.*, 252 S.W.3d 70 (Tex. App.—Austin 2008, pet. denied) (op. on reh'g) (en banc) .......................... 15, 22, 29

24. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35 (Tex. 1998) ............................................................. 30

25. *Parker Barber & Beauty Supply, Inc. v. Wella Corp.*, No. 03-04-00623-CV, 2006 Tex. App. LEXIS 8841 (Tex. App.—Austin Oct. 11, 2006, no pet.) (mem. op.) ............ 30

26. *State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 380 (Tex. 1993) ............................................ 61, 62

27. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440 (Tex. 1993) ............................................................. 40

28. *Tex. Capital Securities, Inc. v. Sandefer*, 108 S.W.3d 923 (Tex. App.—Texarkana 2003, pet. denied) ............ 28

29. *United Blood Servs. v. Longoria*, 938 S.W.2d 29 (Tex. 1997) .................................... 31, 32, 34, 35, 36

30. *Utts v. Short*, 81 S.W.3d 822 (Tex. 2002) ................................... 16, 20

31. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656 (Tex. 2005) ......................................................... 38

32.  *Wein v. Sherman*, No. 03-10-00499-CV, 2013 Tex. App. 10666
(Tex. App.—Austin Aug. 23, 2013, no pet.) (mem. op.)....................14

33.  *White v. Cole*, 880 S.W.2d 292
(Tex. App.—Beaumont 1994, writ denied).........................................40

## Statutes

1.  Tex. Bus. & Com. Code Ann. § 24.002...........................................41

2.  Tex. Bus. & Com. Code Ann. § 24.003...........................................44

3.  Tex. Bus. & Com. Code Ann. § 24.004...........................................59

4.  Tex. Bus. & Com. Code Ann. § 24.005
...............................................2, 18, 37, 39, 41, 44, 57, 58, 59, 60, 61

5.  Tex. Bus. & Com. Code Ann. § 24.006
...............................................2, 18, 37, 39, 41, 44, 47, 57, 58, 59, 60

## Rules

1.  Tex. R. App. P. 39.1 ........................................................................ ix

2.  Tex. R. App. P. 44.1 .................................................................30, 37

3.  Tex. R. Civ. P. 166a....................................30, 31, 32, 34, 35, 36, 38

4.  Tex. R. Evid. 702 .........................................................................33

# STATEMENT OF THE CASE

NATURE OF THE CASE:     Espinosa, as Receiver for Retirement Value, LLC, sued Appellants Poe and SRP and many others for the return of investor money loaned to Retirement Value for the purchase of life insurance policies. [CR 614] As to Poe and SRP, Espinosa sought the return of commissions paid to them by Retirement Value. [CR 614, 617, 705-06] Poe and SRP asserted a general denial and affirmative defenses. [CR 721-26]

COURSE OF THE
PROCEEDINGS:     The trial court granted partial summary judgment for Espinosa on his fraudulent transfer claims against Poe and SRP. [CR 1973; Appx Tab 1] Espinosa nonsuited his remaining claim against Poe and SRP. [CR 1983] The trial court denied Poe and SRP's motion to apply settlement credits [CR 1989; 2 RR 38] and severed Espinosa's claims against Poe and SRP. [CR 2133]

TRIAL COURT
DISPOSITION:     The trial court signed the final judgment on May 28, 2013. [1st Supp CR 3-5; Appx Tab 2] Poe and SRP filed their Motion to Modify the Judgment or alternative Motion for New Trial on June 26, 2014, which was overruled by operation of law. [1st Supp CR 6] Appellants timely appealed on August 20, 2014. [1st Supp CR 64]

# STATEMENT REGARDING ORAL ARGUMENT

Appellants request oral argument pursuant to rule 39.1 of the rules of appellate procedure. Although Appellants believe the facts and legal arguments are thoroughly presented in this brief and in the record, Appellants also believe that this Court's decisional process will be significantly aided by oral argument. Application of the one-satisfaction rule should be simple, but oral argument will aid the Court in applying the rule in this multi-party and multi-theory case. For Appellants' other issues, the record in this case is significant in size, and oral argument will aid the Court in identifying the relevant portions of the record as well as the many genuine issues of material fact that should have precluded summary judgment.

# ISSUES PRESENTED

Issue One: Proper allocation of the one-satisfaction rule required that the trial court grant Appellants a settlement credit for unallocated settlement proceeds of $5.5 million. Because Appellants were found liable for an amount less than the unallocated settlement proceeds, the trial court erred, as a matter of law, by failing to render a take-nothing judgment in Appellants' favor.

Issue Two: The trial court abused its discretion by overruling Appellants' objections to Espinosa's summary judgment evidence.

Issue Three: The trial court erred by rendering summary judgment for Espinosa on his TUFTA claim against Appellants because Espinosa lacked standing and because genuine issues of material fact existed for at least one element of each of Espinosa's TUFTA theories.

**STATEMENT OF FACTS**

On May 5, 2010, the State of Texas filed suit against Retirement Value, LLC ("RV") and others alleging that they were selling unregistered securities, engaging in securities fraud, and violating the Texas Deceptive Trade Practices Act. [2nd Supp CR 72][1] The State sought appointment of a receiver for RV, temporary and permanent injunctions, and restitution for alleged participant-investor losses. [2nd Supp CR 72] Appellee Espinosa was appointed as receiver for RV on that same date. [2nd Supp CR 72] According to Espinosa, RV had assets totaling more than $179 million ($154 million in life insurance policies and $25 million in cash and securities) at the time of the receivership and had obtained loan proceeds of about $77 million from participant-investors. [2nd Supp CR 92-93]

**A.    Parties Relevant to this Appeal**

Among the defendants and third-party defendants to the underlying lawsuit are Ronald James, Donald James, Michael Beste, and James Settlement Services, LLC (collectively, the "James Defendants"). [CR 613, 615] Espinosa has alleged that the James Defendants promoted the life

---

[1] There are several volumes of the Clerk's Record in this appeal. "CR" refers to the original Clerk's Record filed on September 26, 2014, "1st Supp CR" refers to the Clerk's Record filed on November 3, 2014, "2nd Supp CR" refers to the Clerk's Record filed on December 8, 2014, and "3rd Supp CR" refers to the Clerk's Record filed on December 24, 2014.

settlement model to RV, "participated or had the right to participate in control of [RV]," and "played a key role in the organization and operation" of RV. [CR 615, 665]

Appellants James Poe and Senior Retirement Planners, LLC ("SRP"),[2] Poe's business entity, were not original parties to the lawsuit. Espinosa eventually named them as third party defendants. Poe's role was limited to serving as an agent (called "Licensee" in the RV program) who solicited participants for RV's life settlement product. [CR 614, 617; 2nd Supp CR 1029-31]

The trial court determined by summary judgment that Poe was liable under TUFTA[3] for the return of $485,564.13 in commissions that he received from RV. [1st Supp CR 3-5] However, the evidence relating to the fair value of RV's overall assets and liabilities, including the dates on which participants' loans had to be repaid following maturation of the life insurance policies, are central to Espinosa's TUFTA claims against Poe. Discussed below, those claims required that Espinosa prove, among other things, that commission payments to Poe rendered RV insolvent or caused RV to be unable to pay its debts as they came due.

---

[2] References herein to "Poe" include both appellants collectively.

[3] *See* Tex. Bus. & Com. Code Ann. §§ 24.005(a), .006(a).

**B.     RV's Life Settlement Program and RV's Value**

Espinosa described the RV life-settlement program as follows in his initial report to the trial court:

> From April 2009 through March 29, 2010, Retirement Value raised approximately $77 million from more than 900 investors through the sale of investments in its Re-Sale Life Insurance Policy Program.
>
> Each of the investments was structured as a loan to Retirement Value, whereby the investors provided Retirement Value with funds in exchange for Retirement Value's promise to pay a fixed sum of money at an undetermined date in the future. The amount that Retirement Value agreed to pay was tied to the calculated life expectancy of insureds under life insurance policies purportedly owned by Retirement Value. In all instances, Retirement Value agreed to pay a return of 16.5% simple interest per year for the insured's calculated life expectancy. Thus, Retirement Value would pay $18,800 on a $10,000 investment in a policy where the insured had a calculated life expectancy of 64 months. The date on which the insured under the policy died set the date that the investment matured and when Retirement Value would be required to repay the loan. The loan's maturity date did not affect the amount of money that Retirement Value was obligated to pay the investor, except that investors were entitled to a return of unused premiums, if any. [2nd Supp CR 70, 75]

Espinosa's description of the RV program is generally consistent with the Loan Agreement that each participant signed when loaning money to RV. [2nd Supp CR 642-62] On maturity of the life insurance policies, RV would eventually owe the participants, collectively, approximately $125 million, which represented the principal loaned to RV by the participants

3

and the interest RV had agreed to pay the participants upon maturity of the respective insurance policies. [2nd Supp CR 232] Espinosa acknowledged, however, that the debts to participants were not due for quite some time when he wrote that the "date on which the insured under the policy died set the date that the investment matured and when Retirement Value would be required to repay the loan." [2nd Supp CR 75] In a related bankruptcy proceeding, Espinosa testified, consistently, that "the documents speak for themselves, but if you want me to put a voice to them, the documents say that the notes mature upon the maturity of that policy." [2nd Supp CR 75, 746]

In that same involuntary bankruptcy proceeding, Espinosa's counsel made several statements regarding RV's alleged insolvency, its ability to pay debts when due, and the proposed plan of distribution that would repay the participants "in full." Espinosa's counsel identified the RV participants as the creditors [2nd Supp CR 738] and represented to the bankruptcy court that "there are real issues as to whether debts were paid when due, 'due' being the key word here" and that "there is a significant issue of whether Retirement Value is paying debts as they come due, considering they're not really due." [2nd Supp CR 734] Espinosa's counsel also represented that RV owned 48 life insurance policies and had $29 million in cash, and

he said that RV needed only about $19 million to keep all of the policies to maturity. [2nd Supp CR 736] He also told the bankruptcy court that the plan of distribution proposed to the trial court in this case would, in 97.5% of all scenarios, pay back the participants-creditors "in full." [2nd Supp CR 736-37]

## C.    Plan of Distribution

In July 2012, the trial court in this case adopted the Plan of Distribution that Espinosa's counsel referred to in the bankruptcy proceeding. [2nd Supp CR 613] That plan established a claims process by which participants could make claims against RV and by which Espinosa was obligated to make pro rata distributions to participants. [2nd Supp CR 614-19] The Plan ordered Espinosa to liquidate all RV's assets other than the life insurance policies, maintain the life insurance policies through maturity, use the proceeds of maturing policies to pay premiums on remaining policies, keep sufficient reserves to pay premiums on remaining policies, and make pro rata distributions to participants. [2nd Supp CR 620-24] Although the plan limited participants' claims against RV to the amounts loaned to RV (without interest), the plan simultaneously removed the participants' prior obligation to pay necessary premiums beyond the estimated life expectancy of an insured (plus 24 months) in order to keep

5

insurance policies in effect through maturity. [2nd Supp CR 614, 620-21, 642-62] In short, the Plan of Distribution ordered Espinosa to hold all life insurance policies to maturity and then return the participants' initial loan proceeds to them, with discretion to Espinosa to make interim distributions from receivership assets. [2nd Supp CR 618-21]

**D.    Espinosa as Litigation Plaintiff**

In addition to proposing and gaining approval of the Plan of Distribution, Espinosa initiated litigation against the James Defendants and others, who he claimed were responsible for RV's downfall. [CR 613] Espinosa also added claims against Poe and the other Licensees who solicited participants for the RV program. [*see, e.g.*, CR 613]

Espinosa's live pleading was his Eighth Amended Cross-Claim and Third-Party Claim, filed on March 18, 2013. [CR 613] In that pleading, Espinosa asserted claims against the James Defendants, Poe, and many others for breach of fiduciary duty, conspiracy to breach fiduciary duty, and aiding and abetting breach of fiduciary duty, and Espinosa alleged that these parties were jointly and severally liable for $77 million, which included the return of all commissions paid by RV to Poe and the other Licensees. [CR 613, 615, 617, 640, 681, 685, 687-91] Espinosa alleged that the James Defendants "promoted the scheme to Retirement Value" and

6

"participated or had the right to participate in control of Retirement Value." [CR 615] Espinosa alleged that the defendants, including the James Defendants, "caused [RV] to operate a fraudulent investment scheme," [CR 642] that RV sold the securities "through a group of agents which it called 'Licensees,'" and that "the James Defendants assisted in the recruitment of licensees by identifying potential targets for recruitment and working with Gray to convince the potential licensees to sell Retirement Value's investment product." [CR 641]

Other allegations in Espinosa's live pleading include:

- The scheme took in approximately $77 million from over 900 investor-victims and promised to pay them approximately $130 million. [CR 646]

- All of the Third-Party Defendants also conspired to breach the fiduciary duties they and the officers of Retirement Value owed to Retirement Value by using Retirement Value to pay themselves exorbitant and unconscionable fees and commissions in violation of the Texas Securities Act. [CR 663]

- The Conspiring Defendants – as identified below, and which includes the James Defendants and Beste – are jointly and severally liable for the full amount that Retirement Value has been ordered to pay in restitution to investors. All Licensee Defendants who are not also Conspiring Defendants are liable for the total amount of commissions they received. [CR 681]

- The James Defendants and Beste also owed Retirement Value a fiduciary duty by virtue of their special relationship with Retirement Value. [CR 687]

7

- The Conspiring Defendants engaged in affirmative acts to further the goals of the conspiracy. The Conspiring Defendants, therefore, are jointly and severally liable for all losses that were proximately caused by any member of the conspiracy as well as losses incurred after Defendants left the conspiracy – assuming such withdrawal from the civil conspiracy actually occurred. [CR 690]

- Retirement Value is now liable to the investor victims for damages, attorneys' fees and for having to return to them all of the money they invested in Retirement Value. The Conspiring Defendants are thus jointly and severally liable for all of those damages, without regard to whether such Defendants participated in all aspects of the conspiracy. [CR 691]

Espinosa thus sued Poe for the return of Poe's commissions and sued the James Defendants for all $77 million, which included Poe's commissions, alleging that the James Defendants were jointly and severally liable with Poe for the return of Poe's commissions.

Espinosa also asserted claims against the James Defendants that related solely to amounts the James Defendants received from RV (i.e., for the James Defendants' sole liability). Under a money had and received theory, Espinosa sued the James Defendants for the return of approximately $20 million, [CR 704-05] and Espinosa sued the James Defendants under TUFTA for the return of $28,902,092, which Espinosa alleged had been paid to the James Defendants to purchase life insurance policies. [CR 705-06]

8

**E.      Espinosa Collects Unallocated Settlement Proceeds**

About a month after filing his Eighth Amended Cross-Claim and Third-Party Claim, Espinosa entered into a Settlement Agreement and Release of All Claims with the James Defendants (the "James Settlement Agreement"). [CR 2023; Appx Tab 3] The James Defendants paid Espinosa $5.5 million in unallocated funds to settle all claims against them. [CR 2024; Appx Tab 3] The James Settlement Agreement did not release Espinosa's claims against Poe, but it also did not allocate any of the settlement proceeds by stating that the James Defendants were paying damages for which only they were solely liable or that the James Defendants were not paying damages for which Espinosa had alleged the James Defendants and Poe were jointly and severally liable. [CR 2027, 2023-29; Appx Tab 3]

**F.      Espinosa's Motion for Summary Judgment Against Poe**

On May 1, 2013, soon after settling with the James Defendants, Espinosa filed his Motion for Partial Summary Judgment as to Licensee Defendants (including Poe). [2nd Supp CR 3] Poe filed his response to the motion on October 1, 2013 and asserted objections to Espinosa's summary judgment evidence. [2nd Supp CR 479, 571] The trial court overruled Poe's evidentiary objections by written order. [CR 1964] Judge Triana also

indicated at the hearing on the motion for summary judgment that she intended to grant summary judgment for Espinosa on his TUFTA claims against Poe. [CR 1966] On December 10, 2013, the trial court signed an order granting partial summary judgment to Espinosa on his TUFTA claim against Poe. The order contained a liability finding only against Poe, but it was granted as to liability and damages against SRP. [CR 1973-74] The order is not a general order; it is limited only to the TUFTA claim, does not include a finding that RV operated as a Ponzi scheme, and does not rule on Espinosa's money had and received claim.[4]

Given Judge Triana's indication that she would grant summary judgment against Poe based on the amount of commissions he received, Espinosa and Poe entered into a stipulation that Poe had received $485,564.13 in commissions from RV but not that those commissions were properly recoverable as TUFTA damages or that Espinosa had proven his entitlement to recovery of those damages. [CR 1966] The stipulation further reserved all of Poe's appellate arguments. [CR 1966-67]

---

[4] Espinosa subsequently nonsuited his money had and received claim, [CR 1983] leaving only the TUFTA claim against Poe. The trial court had granted summary judgment for Poe on Espinosa's other causes of action against him. [CR 1974]

## G. Poe Sought Credit for Unallocated James Settlement Proceeds

After the trial court adjudicated Poe's liability, but before the trial court signed the judgment, Poe moved the trial court for a take-nothing judgment under the one-satisfaction rule because Espinosa sued both the James Defendants and Poe for recovery of Poe's commissions and collected unallocated settlement proceeds from the James Defendants, entitling Poe to a credit for the $5.5 million, unallocated James Settlement. [CR 1989] Judge Triana conducted a hearing on the motion but denied it. [2 RR 2-38]

## H. Judgment and Appeal

On May 28, 2014, the trial court severed Espinosa's claims against the various licensee defendants into separate lawsuits. [CR 2133] Also on May 28, 2014, the trial court signed a judgment in the severed cause against Poe and SRP for $485,564.13 in actual damages, $182,086.55 in attorney's fees, $7,142.86 in conditional appellate attorney's fees, and interest. [1st Supp CR 3-5] Poe and SRP timely filed their Motion to Modify, Reform, or Correct Judgment and Alternative Motion for New Trial on June 26, 2014, which was overruled by operation of law. [CR 2136] On August 20, 2014, Poe and SRP timely filed notice of this appeal. [1st Supp CR 64]

## SUMMARY OF THE ARGUMENT

The trial court, as a matter of law, erred by failing to grant Poe a settlement credit for the unallocated settlement proceeds of $5.5 million from the James Defendants. The one-satisfaction rule precludes a plaintiff from recovering twice for the same injury. Espinosa sued the James Defendants and Poe, asserting joint and several liability, for the recovery of commissions Poe received from RV. Espinosa collected $5.5 million in unallocated settlement proceeds from the James Defendants and did not state within the settlement agreement that the settlement proceeds represented payment for damages that were the sole liability of the James Defendants. Espinosa could have so allocated, but he did not. Settled law from this and other courts throughout Texas required that the trial court grant Poe a settlement credit in the entire amount of the James Defendants' $5.5 million, unallocated settlement. Because Poe's adjudicated liability was for an amount less than the applicable settlement credit, the trial court erred by refusing to render a take-nothing judgment in Poe's favor.

Alternatively, the trial court erred by granting summary judgment for Espinosa on his TUFTA claims against Poe. Espinosa lacks standing to pursue these claims. In addition, Espinosa's summary judgment evidence

12

was inadmissible, lacked credibility, and contained internal inconsistencies that should have precluded summary judgment. Among other things, Espinosa's evidence regarding the fair value of RV's assets and liabilities, the values of which are necessary to determine whether RV was insolvent and whether RV had sufficient remaining assets to pay its debts as they came due, was shown through the summary judgment response to be little more than mathematic gamesmanship in violation of applicable accounting principles. Espinosa and his retained expert applied no discount rate to RV's liabilities in order to keep them as high as possible while applying huge discount rates to RV's assets, dropping the alleged value of the insurance policies from more than $130 million to approximately $5 million so that RV's assets would purportedly be worth less than the liabilities. The retained expert, however, admitted in his deposition that he should have also applied a discount rate to RV's liabilities and that a reduction in the value of RV's liabilities similar to his reduction of RV's assets would mean that RV was not insolvent. Moreover, Espinosa and his attorney represented to a bankruptcy court that RV had sufficient assets and premium reserves to pay all life insurance policies through maturation and to repay all participant investors "in full." Genuine issues of material fact

precluded summary judgment, and the trial court erred by granting Espinosa's motion.

## ARGUMENT

**Issue One: Proper allocation of the one-satisfaction rule required that the trial court grant Appellants a settlement credit for unallocated settlement proceeds of $5.5 million. Because Appellants were found liable for an amount less than the unallocated settlement proceeds, the trial court erred, as a matter of law, by failing to render a take-nothing judgment in Appellants' favor.**

### A.    Standard of Review

The trial court's settlement credit ruling should be reviewed de novo because there are no disputed fact issues. *See Galle, Inc. v. Pool*, 262 S.W.3d 564, 571 n.3 (Tex. App.—Austin 2008, pet. denied) (applying de novo standard of review in the absence of disputed fact questions). If there are disputed fact questions, the review is for an abuse of discretion. *See Dalworth Restoration, Inc. v. Rife-Marshall*, 433 S.W.3d 773, 781 (Tex. App.—Fort Worth 2014, pet. dism'd w.o.j.); *see also Wein v. Sherman*, No. 03-10-00499-CV, 2013 Tex. App. 10666, at *37-38 (Tex. App.—Austin Aug. 23, 2013, no pet.) (mem. op.) (discussing de novo and abuse of discretion standards of review in settlement credit context).

### B.    Applicable Law

"The one satisfaction rule prohibits a plaintiff from recovering twice for a single injury." *Cohen v. Arthur Anderson, L.L.P.,* 106 S.W.3d 304, 308

14

(Tex. App.—Houston [1st Dist.] 2003, no pet.) (citing *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000)).  The rule applies "when multiple defendants commit the same act or when multiple defendants commit technically different acts that result in a single injury."  *Id.* (citing *Crown*, 22 S.W.3d at 390).  As this Court has recognized, the one-satisfaction rule "is not limited to tort claims, and whether the rule may be applied depends not on the cause of action asserted but rather the injury sustained."  *Osborne v. Jauregui, Inc.*, 252 S.W.3d 70, 75 (Tex. App.—Austin 2008, pet. denied) (op. on reh'g) (en banc).   "Thus, if the plaintiff has suffered only one injury, even if based on 'overlapping and varied theories of liability,' the plaintiff may only recover once."  *Id.* (quoting *Buccaneer Homes of Alabama, Inc. v. Pelis*, 43 S.W.3d 586, 590 (Tex. App.—Houston [1st Dist.] 2001, no pet.)).

Under the common law, the nonsettling defendant has the initial burden of proving his entitlement to a settlement credit, which the nonsettling defendant meets by "placing the settlement agreement or some evidence of the settlement amount in the record."  *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 927 (Tex. 1998).  The burden then shifts to the plaintiff "to tender a valid settlement agreement allocating the settlement between (1) damages for which the settling and nonsettling defendant are jointly liable, and (2) damages for which only the settling party was liable."

15

*Cohen*, 106 S.W.3d at 310 (citing *Crown*, 22 S.W.3d at 392).  The Supreme Court of Texas established this burden-shifting framework in part because the plaintiff, as one of the settling parties, is "in a better position than nonsettling defendants to ensure that the settlement awards are properly allocated."  *Utts v. Short*, 81 S.W.3d 822, 828 (Tex. 2002) (citing *Ellender*, 968 S.W. 2d at 928).[5]

"[T]he plaintiff cannot rely on evidence that is extrinsic to the settlement agreement" in meeting his burden to prove allocation of settlement proceeds.  *Dalworth Restoration,* 433 S.W.3d at 781 (citing *Ellender*, 968 S.W.2d at 928-29).  If there is no allocation within the settlement agreement itself, the nonsettling defendant must receive a credit for the full amount of the settlement.  *Cohen*, 106 S.W.3d at 310 (citing *Ellender*, 968 S.W.2d at 928).

## C.    Applicable Facts

In his March 18, 2013 Eighth Amended Cross-Claim and Third-Party Claim, Espinosa asserted claims against the James Defendants, Poe, and many others for breach of fiduciary duty, conspiracy to breach fiduciary

---

[5] This burden-shifting framework applies equally in cases involving application of the common law one-satisfaction rule and cases applying Chapter 33 of the Texas Civil Practice and Remedies Code.  *See Ellender*, 938 S.W.2d at 927-28 (applying rule to Chapter 33 analysis); *see also Utts*, 81 S.W.3d at 832; *Dalworth Restoration*, 433 S.W.3d at 781 ("[S]ection 33.012(b) 'upholds' the common-law's one-satisfaction rule.").

duty, and aiding and abetting breach of fiduciary duty, and Espinosa alleged that these parties were jointly and severally liable for $77 million, which included the return of all commissions paid by RV to Poe and the other Licensees. [CR 613, 615, 617, 640, 681, 685, 687-91] Espinosa alleged in part as follows:

> The Conspiring Defendants – as identified below, and which includes the James Defendants and Beste – are jointly and severally liable for the full amount that Retirement Value has been ordered to pay in restitution to investors [$77 million]. All Licensee Defendants who are not also Conspiring Defendants are liable for the total amount of commission they received."[6] [CR 681]

Thus, Espinosa sued Poe for the return of Poe's commissions and sued the James Defendants for all $77 million, which included Poe's commissions, and Espinosa asserted that the James Defendants were jointly and severally liable with Poe for the return of Poe's commissions.

About a month after filing his Eighth Amended Cross-Claim and Third-Party Claim, Espinosa entered into a Settlement Agreement and Release of All Claims with the James Defendants (the "James Settlement Agreement"). [CR 2023; Appx Tab 3] The James Defendants paid Espinosa $5.5 million in unallocated funds to settle all claims against them. [CR 2024; Appx Tab 3] The James Settlement Agreement states that it did

---

[6] Some of Espinosa's other allegations of joint and several liability are quoted in the fact section, above.

not release Espinosa's claims against the Licensees (including Poe), but it also did not allocate the settlement proceeds to any particular claim, theory of recovery, or element of damages. Nor did the James Settlement Agreement state that the James Defendants were *not paying* damages for which the James Defendants and Poe were alleged to be jointly and severally liable. [CR 2027, 2023-29; Appx Tab 3] The release language is very broad and releases "any and all claims" and "causes of action of any nature" between the parties. [CR 2025-26; Appx Tab 3] Nowhere within the James Settlement Agreement is there any language stating or implying that the James Defendants were paying only damages for which the James Defendants were solely liable or that the James Defendants were paying only for punitive damages. [CR 2023-29; Appx Tab 3]

On December 10, 2013, Judge Triana signed an order granting Espinosa's Motion for Partial Summary Judgment as to Certain Licensees on Espinosa's TUFTA claim.[7] [CR 1973-74] As to Poe, the summary judgment order adjudicated his alleged liability for $485,564.13, the amount of commissions he and SRP collectively received. [CR 1973-74, 1966-67, 2142-43] After the summary judgment order, Poe filed his Supplement to

---

[7] *See* Tex. Bus. & Com. Code Ann. §§ 24.005, .006.

Certain Licensees' Motion for Application of Settlement Credits.[8] [CR 1989] The trial court conducted a hearing on the motion on February 18, 2014, but denied the motion. [2 RR 2, 38] Poe again raised the settlement credit issue in his motion to modify the judgment, which was overruled by operation of law. [CR 2136-38]

## D.    Application of Law to Fact

Poe clearly met his burden for application of settlement credits under the one-satisfaction rule.  Poe asked the trial court, prior to judgment and after Poe's liability had been adjudicated by the trial court, to apply the settlement credit and render a take-nothing judgment in his favor. [CR 1989, 1995] Poe's motion established that Espinosa had sought joint and several liability against both Poe and James Settlement Services for the commissions that Poe received from RV, and Poe put the James Settlement Agreement into the record, thereby advising the trial court of both the amount of Espinosa's settlement with the James Defendants and the terms of that settlement. [CR 1989-95, 2023] *See Ellender*, 968 S.W.2d at 927; *Buccaneer Homes*, 43 S.W.3d at 589.  The burden then shifted to Espinosa to show the trial court—by using only the James Settlement

---

[8] Poe and other Licensee Defendants had filed other, earlier motions to determine the applicability of settlement credits, but those motions were filed and heard before the trial court had adjudicated the Licensee Defendants' alleged liability for returning their commissions under TUFTA. [CR 1113, 1164]

Agreement—that the James Settlement Agreement allocated the settlement proceeds to include payment only for the James Defendants' sole liability. See *Dalworth Restoration*, 433 S.W.3d at 781 (holding that "the plaintiff cannot rely on evidence that is extrinsic to the settlement agreement" in meeting his burden to prove allocation of settlement proceeds). Espinosa did not meet his burden, and the trial court erred, as a matter of law, by failing to grant Poe a credit for at least the $5.5 million, unallocated settlement.

As the Texas Supreme Court has recognized, Espinosa was in the best position to allocate the James Defendants' settlement payment. *See Utts*, 81 S.W.3d at 828; *Ellender*, 968 S.W.2d at 928. Espinosa could have allocated had he chosen to do so. For example, Espinosa asserted claims against the James Defendants for which Poe and the James Defendants would not have had joint and several liability, including a claim against the James Defendants under a money had and received theory for the return of approximately $20 million in profits [CR 704-05] and a claim against the James Defendants under TUFTA for the return of $28,902,092, which Espinosa alleged had been paid from RV to the James Defendants to purchase life insurance policies. [CR 705-06] The James Settlement Agreement could have allocated the settlement proceedings by stating that

20

the James Defendants were settling only for punitive damages, only for the profits that they allegedly received from RV, or only for the return of money paid to the James Defendants by RV for the purchase of insurance policies. There is no such allocation language in the James Settlement Agreement. [CR 2023-29; Appx Tab 3]

This Court has explained a similar situation as follows:

> Although it is theoretically possible that some of the damages the [plaintiffs] sought to recover against Allstate and for which they were compensated in the settlement agreement may have been separate rather than joint, it was the [plaintiffs'] burden to offer evidence allocating the settlement between actual damages for which only Allstate was liable and those for which Allstate and Galle were jointly liable, in order to limit the credit to the former. They failed to do so.

*Galle*, 262 S.W.3d at 573 (citation omitted). As in *Galle*, it is theoretically possible that some of the damages Espinosa sought from the James Defendants—and for which Espinosa was compensated by the unallocated settlement proceeds—may have been separate rather than joint damages, but Espinosa had the burden and duty to include allocation of separate damages within the James Settlement Agreement. He failed to do so.

Because there is no allocation for separate, as opposed to joint, damages within the James Settlement Agreement, the trial court was required to give Poe a credit for the entire amount of the James Defendants' $5.5 million settlement and render a take-nothing judgment

21

against Espinosa on his claims against Poe.  *See, e.g., Crown*, 22 S.W.3d at 392 (finding nonsettling insurance agent entitled to offset of damages paid in settlement by insurance company); *Dalworth Restoration*, 433 S.W.3d at 785; *Galle*, 262 S.W.3d at 573.  As a matter of law, the trial court erred by failing to do so.

## E.    Espinosa's Trial Court Arguments Missed the Point

Espinosa argued to the trial court that settlement credits cannot apply to the damages awarded against Poe because Poe was found, via no-evidence summary judgment, not to have engaged in a civil conspiracy as Espinosa had alleged. [CR 2085] This is wrong because application of the one-satisfaction rule does not hinge on the existence of a conspiracy, nor does the rule depend on the cause of action asserted.  Instead, the rule is applied by looking to the specific injury at issue.  *Osborne*, 252 S.W.3d at 75 ("The application of the [one-satisfaction] rule is not limited to tort claims, and whether the rule may be applied depends not on the cause of action asserted but rather the injury sustained.").[9]  In fact, appellate courts have routinely applied settlement credits in favor of nonsettling defendants

---

[9] *See also Cohen*, 106 S.W.3d at 310 ("Although the causes of action alleged are technically different, they resulted in a single injury, loss of trust assets."); *Buccaneer Homes*, 43 S.W.3d at 590 ("If there is only one injury, even if it is based on several overlapping and varied theories of liability, a plaintiff will be permitted only one recovery.").

when there was no allegation of conspiracy. *See, e.g., Dalworth Restoration*, 433 S.W.3d at 776, 782-83; *Goose Creek Consol. Indep. Sch. Dist. of Chambers v. Jarrar's Plumbing*, 74 S.W.3d 486, 504 (Tex. App.—Texarkana 2002, pet. denied); *Buccaneer Homes*, 43 S.W.3d at 588-91. The question is whether Espinosa sued both Poe and the James Defendants to recover for the same injury—the commissions paid to Poe. There can be no legitimate dispute that, at the time of the unallocated James Defendants' settlement, the allegations in Espinosa's live pleading sought joint and several liability against the James Defendants and Poe for the return of Poe's commissions.

Moreover, while Poe did prevail on the conspiracy claim against him individually, the conspiracy and other claims against the James Defendants were never adjudicated because of the James Defendants' settlement. *See Crown*, 22 S.W.3d at 391 ("Normally, claims against the settling party are dropped before the jury returns a verdict, so the amount of sole damages that the settling party is potentially liable for is rarely determined."). Had those claims been adjudicated, the trial court may have rendered judgment against the James Defendants for the entire $77 million that Espinosa had sued the James Defendants to recover, including Poe's commissions.

Espinosa also argued to the trial court that "settlement credits do not apply *to any other licensee* on the TUFTA claims *because no licensee is jointly and severally liable under TUFTA for any commissions that were paid to other licensees.*" [CR 2082] [Emphasis added.] To support his argument, Espinosa analogized the current situation to one in which ABC Investments paid commissions of $10,000 to Licensee X and ninety-nine other licensees and in which the plaintiff asserted commission claw-back claims against all 100 licensees. [CR 2083] Espinosa then asserted that Licensee X would not be entitled to a settlement credit based on another licensee's settlement for $10,000 because doing so would leave $990,000 in unrecovered commissions from the other ninety-nine licensees. [CR 2083] Espinosa's analogy is fatally flawed because it makes no mention of a claim against, and an unallocated settlement from, ABC Investments exceeding $10,000. Espinosa incorrectly focused only on credits from one licensee to another and completely omitted the only relevant settlement.

Poe does not seek a credit for another licensee's settlement. Rather, if Poe were Licensee X, he would be entitled to a credit for an unallocated settlement with ABC Investments because of an allegation of joint and several liability between ABC Investments and Licensee X. ABC Investments in the analogy is similar to the James Defendants in this case.

24

Poe is entitled to a credit for the unallocated James Defendants' settlement because Espinosa sued both the James Defendants and Poe for the return of Poe's commissions and settled with the James Defendants without allocating the settlement proceeds. The single injury at issue, and for which Espinosa already recovered unallocated settlement funds from the James Defendants, is the amount of Poe's commission.

A better analogy for application of the one-satisfaction rule in this case is that of a construction defect lawsuit against the general contractor and numerous subcontractors for unrelated defects in the completed building. *See Goose Creek*, 74 S.W.3d at 502-04. In *Goose Creek*, Goose Creek sued the general contractor and the architects for defects in three newly-constructed schools. *Id.* at 491. The general contractor filed third-party actions against other parties responsible for the design or installation of various defective systems, including the plumbing contractor. *Id.* Goose Creek then added a direct claim against the plumbing contractor. *Id.* at 491-92. Goose Creek settled with the general contractor and other parties for $1.9 million. *Id.* at 502. The settlement agreement released the general contractor and all subcontractors but did not release the plumbing contractor. *Id.* at 492. The jury ultimately determined that Goose Creek had suffered $405,000 in plumbing-related damages. *Id.* at 502. At the

time of Goose Creek's settlement with the general contractor and others, Goose Creek's live pleading "included allegations against the settling defendants for plumbing damages and negligence similar to those retained in Goose Creek's amended pleadings" against the plumbing contractor. *Id.* at 503.

After trial, the plumbing contractor asked the trial court to apply a settlement credit and render a take-nothing judgment in its favor because Goose Creek's settlement with the general contractor and others exceeded the plumbing contractor's liability as determined by the jury. *Id.* at 502. The trial court reviewed the settlement agreements, "found that there was no allocation within the agreements stating the amount allocated for the plumbing problems," applied a settlement credit for the full amount of the settlement proceeds, and rendered a take-nothing judgment in favor of the plumbing contractor because the unallocated settlement proceeds exceeded the plumbing contractor's liability as determined by the jury. *Id.* at 502, 502-04. The appellate court affirmed the trial court's correct application of settlement credits. *Id.* at 504.

The general contractor and subcontractor scenario in the *Goose Creek* opinion is a better illustration of how the trial court should have applied the one-satisfaction rule in this case. Just as the plumbing defects

26

in *Goose Creek* were a single injury for which Goose Creek sought recovery from both the general contractor and the plumbing contractor, the commissions paid to Poe in this case were the single injury for which Espinosa sought recovery, jointly and severally, from both the James Defendants and Poe. Had Goose Creek also sued for electrical defects in the buildings, the electrical defects would have been a separate injury for which the plumbing contractor would not have shared joint liability.

The licensees in this case are similar to subcontractors on a construction project who worked on different aspects of the building. One subcontractor does not have joint liability with another subcontractor, but the subcontractor and general contractor do have joint and several liability for common damages. If the plaintiff settles with the general contractor after having sued both the general contractor and the plumbing subcontractor for plumbing damages, the plaintiff must ensure that the settlement agreement allocates damages to clarify that the general contractor was not paying for plumbing damages. The failure to do so entitles the subcontractor to a settlement credit equal to the full amount of the general contractor's settlement with the plaintiff. *See id.* at 502-04; *see also Crown*, 22 S.W.3d at 392 (finding nonsettling insurance agent entitled to offset of damages paid in settlement by insurance company); *Dalworth*

*Restoration*, 433 S.W.3d at 785 (noting overlap of settled and tried claims and rendering judgment for home restoration company based on settlement between plaintiff and her insurance company in a related federal court suit); *Galle*, 262 S.W.3d at 573 (reversing and rendering judgment for remediation contractor in mold suit based on plaintiffs' settlement with insurance company); *Tex. Capital Securities, Inc. v. Sandefer*, 108 S.W.3d 923, 926-27 (Tex. App.—Texarkana 2003, pet. denied) (in securities fraud case, discharging brokerage firm defendant from further liability because of settlement between plaintiff and a stock promoter); *Cohen*, 106 S.W.3d at 310-11 (rendering judgment for accounting firm because plaintiffs' settlement with other defendants for common damages of loss of trust assets exceeded accounting firm's liability); *Buccaneer Homes*, 43 S.W.3d at 589-91 (reversing and rendering judgment for mobile home manufacturer based on plaintiff's settlement with mobile home seller in suit alleging defects in mobile home).

The single injury for which the trial court found Poe liable is the $485,564.13 in commissions he received. Espinosa sued Poe and the James Defendants for that same $485,564.13, alleging that they were jointly and severally liable for those commissions. But Espinosa already recovered more than that amount in unallocated settlement proceeds from

the James Defendants (who paid Espinosa $5.5 million). Poe is entitled to a settlement credit for the entire $5.5 million, unallocated settlement, which exceeds Poe's alleged liability to Espinosa. The trial court therefore erred, as a matter of law, by failing to render a take-nothing judgment against Espinosa on his claims against Poe.

## F. TUFTA Attorney Fee Award and Harmful Error

Poe is entitled to rendition of judgment in his favor on the damage award against him as determined by the trial court. Because the damage award against Poe must be reversed, the attorneys' fee award must also be reversed and rendered in Poe's favor. *See Osborne*, 252 S.W.3d at 76-77 (holding plaintiffs could not recover attorneys' fees from nonsettling defendant when application of one-satisfaction rule barred plaintiffs' damage recovery against the nonsettling defendant); *Buccaneer Homes*, 43 S.W.3d at 590-91 (applying one-satisfaction rule, reversing and rendering judgment in nonsettling defendant's favor, and holding that because the one-satisfaction rule prevented the plaintiff's recovery against the nonsettling defendant on the liability theory, attorney fee award also could not stand).

Finally, the trial court's error was obviously harmful and reversible. The trial court's failure to properly apply settlement credits led to rendition

of judgment for $667,650.68 plus interest and appellate attorneys' fees rather than a take-nothing judgment in Poe's favor. [CR 2142-44] *See* Tex. R. App. P. 44.1(a).

**Issue Two: The trial court abused its discretion by overruling Appellants' objections to Espinosa's summary judgment evidence.**

**A. Standard of Review**

This Court reviews the trial court's rulings on objections to summary judgment evidence under an abuse of discretion standard. *See Fairfield Fin. Group, Inc. v. Synnott*, 300 S.W.3d 316, 319 (Tex. App.—Austin 2009, no pet.). A trial court abuses its discretion when it acts without regard for guiding rules or principles. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).[10]

**B. Argument**

Testimonial evidence from an interested witness or expert must be "clear, positive and direct, otherwise credible and free from contradictions and inconsistencies" and readily controvertible. Tex. R. Civ. P. 166a(e). "Texas Rule of Civil Procedure 166a(f) requires that in summary judgment

---

[10] Poe preserved error on his objections by filing written objections and getting express rulings from the trial court on each objection. [2nd Supp CR 571-72; CR 1964-65] *See Neely v. Comm'n for Lawyer Discipline*, 302 S.W.3d 331, 344 (Tex. App.—Houston [14th Dist.] 2009, pet. denied); *Parker Barber & Beauty Supply, Inc. v. Wella Corp.*, No. 03-04-00623-CV, 2006 Tex. App. LEXIS 8841 at *32-34 (Tex. App.—Austin Oct. 11, 2006, no pet.) (mem. op.).

proceedings, supporting and opposing affidavits 'shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'" *United Blood Servs. v. Longoria*, 938 S.W.2d 29, 30 (Tex. 1997) (quoting Tex. R. Civ. P. 166a(f)). "When a party relies on expert testimony, this requirement includes proof of the expert's qualifications." *Id.*

Poe objected to certain paragraphs within Espinosa's July 29, 2011 Affidavit, Espinosa's May 1, 2013 Affidavit, and Burchett's May 1, 2013 Affidavit because the affidavits did not establish the affiants' qualifications to offer the expert opinions within them (phrased as competence in the written objections). [2nd Supp CR 496, 500-01] *See Longoria*, 938 S.W.2d at 30; Tex. R. Civ. P. 166a(f) (requiring affidavit to set forth affiant's "competence" to testify). None of the matters within these paragraphs is within the common knowledge of a layperson.

Poe also objected to the Espinosa and Burchett affidavits on the following grounds: (1) the opinions asserted in the affidavits are not reliable in that they (a) contain an incorrect calculation of the fair value of RV's assets and liabilities; (b) violate accounting principles by failing to apply the same discount rate to value RV's liabilities that was applied to value RV's insurance policy assets; (c) rely on inadequate information from

31

Lewis & Ellis which the affiants did not test, and Lewis & Ellis itself relied on unverified data; and (d) merely parrot the work of others or apply mathematical calculations to work performed by others; and (2) the opinions in the affidavits are merely impermissible conclusions. [CR 571-72]

1. Espinosa's July 29, 2011 Affidavit [2nd Supp CR 53]

Poe objected to Paragraph 7 of Espinosa's July 29, 2011 Affidavit, in which Espinosa opined that RV was insolvent because the market value of its assets ($29 million in cash and insurance policies "with an estimated liquidation value of $5.7 million") was far less than its alleged debts of $125.1 million.[11] [2nd CR Supp 571-72, 55] The trial court abused its discretion by overruling objections to this paragraph because Espinosa's affidavit does not establish his qualifications to render these expert opinions (such as market value of assets or present-value of debts). *See Longoria*, 938 S.W.2d at 30; Tex. R. Civ. P. 166a(f). The proffered opinions are also conclusory because the affidavit does not set forth the underlying facts that allegedly support the conclusions. *See Burrow v. Arce*, 997 S.W. 2d 229 (Tex. 1998) ("[I]t is the basis of the witness's

---

[11] RV's debt number is no longer $125 million, if it ever was, because the trial court limited participant claims to the amount of their initial investment. [2nd Supp CR 614] The sum of all participant loans was approximately $77 million.

opinion, and not the witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law; a claim will not stand or fall on the mere *ipse dixit* of a credentialed witness."). In other words, Espinosa does not explain how or why the insurance policy assets (with $130 million in face value) are valued at only $5 million or why debts that are not due for years are kept at face value. Also, even if Espinosa were somehow qualified as a valuation expert, his asserted opinions are inherently unreliable because they violate accounting principles by failing to apply the same (or any) discount rate to RV's debts that was applied to RV's assets. Espinosa applied a huge discount rate to RV's assets but applied no discount rate to RV's liabilities. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995) ("Unreliable evidence is of no assistance to the trier of fact and is therefore inadmissible under Rule 702."). By way of illustration, Espinosa put forward other summary judgment evidence that RV's portfolio of policies had a "total face amount of $134,835,000 at the time of the receivership," an amount that exceeds the alleged debts of $125.1 million. [2nd Supp CR 257, 55] It is only through unexplained manipulation of discount rates to RV's $135 million in assets that Espinosa proffers in his affidavit that the $135 million in insurance policies is supposedly worth only $5.7 million. [2nd CR Supp 55] Despite

this mysterious application of an enormous discount rate, Espinosa's affidavit contains a purported estimate of RV's liabilities that does not have any discount rate applied.[12] [2nd Supp CR 55] The trial court abused its discretion by overruling Poe's objection to Paragraph 7 of Espinosa's July 29, 2011 Affidavit.

Poe also objected to Paragraphs 34 through 37 of Espinosa's July 29, 2011 Affidavit on the same grounds. [2nd Supp CR 571-72; 2nd Supp CR 65-67] In those paragraphs, Espinosa discusses alleged premium reserve deficiencies in RV's accounts and discusses the alleged unreasonableness of the life expectancy calculations performed by Midwest Medical. Espinosa's Affidavit contains no discussion of his qualifications to render these expert opinions, and all opinions in Paragraphs 34 through 37 should have therefore been stricken. *See Longoria*, 938 S.W.2d at 30 (expert affidavit must contain qualifications); Tex. R. Civ. P. 166a(f). Moreover, the opinions are conclusory and are simply wrong and therefore unreliable. For example, Espinosa opines that RV reserved too little money to pay premiums because the life expectancy estimates were too short, but RV was never responsible for paying additional premiums once a certain policy

---

[12] To further illustrate the unreliability of Espinosa's opinion, his own expert, Burchett, admitted in his deposition that a fair valuation of Retirement Value's debts required application of the same or a similar discount rate as was applied to the assets. [2nd Supp CR 762]

34

reached the estimated life expectancy plus 24 months.  Under the contract each participant signed, the participant had the responsibility to pay policy premiums beyond the estimated life expectancy (plus 24 months). [2nd Supp CR 642, 645] Espinosa's opinion to the contrary is unexplained (and therefore conclusory) and is directly contradicted by the applicable contracts (and therefore unreliable).  *See Burrow*, 997 S.W.2d at 235 (conclusory opinions prohibited); *Robinson*, 923 S.W.2d at 557 (unreliable expert opinions inadmissible).  The trial court abused its discretion by overruling Poe's objections to Paragraphs 34 through 37 of Espinosa's July 29, 2011 Affidavit.

2.    Espinosa's May 1, 2013 Affidavit [2nd Supp CR 231]

Poe objected to Paragraph 7 of Espinosa's May 1, 2013 Affidavit. [2nd Supp CR 571-72] In that paragraph, Espinosa asserted various opinions about shortfalls in RV's premium reserves. [2nd Supp CR 232] However, Espinosa's Affidavit contains no discussion of his qualifications to render expert opinions, and the trial court abused its discretion by overruling Poe's objection to Paragraph 7 of Espinosa's May 1, 2013 Affidavit.  *See Longoria*, 938 S.W.2d at 30 (expert affidavit must contain qualifications); Tex. R. Civ. P. 166a(f).

3.    Burchett May 1, 2013 Affidavit [2nd Supp CR 233]

Poe objected to Paragraphs 5 through 14 of Burchett's May 1, 2013 Affidavit. [2nd Supp CR 571-72; see 2nd Supp CR 233] First, the trial court abused its discretion by overruling Poe's objection to Burchett's affidavit because his affidavit does not establish his qualifications to render opinions about the value of life insurance policies or the application of discount rates to assets and liabilities, yet all of Burchett's opinions in Paragraphs 5 through 12 are beyond the common knowledge of a layperson.  *See Longoria*, 938 S.W.2d at 30 (expert affidavit must contain qualifications); Tex. R. Civ. P. 166a(f).

In addition, the assertions in paragraphs 5 through 14 of the Burchett Affidavit are inherently unreliable.   Similar to the Espinosa affidavit assertions regarding the alleged "fair" value of RV's assets and liabilities, Burchett parroted an enormous 20% discount rate to drop the alleged value of RV's insurance policies from $135 million to about $5 million.  He then opined that RV's debts are "fairly" valued at about $80 million, but that value is without any discount rate even though the obligations do not arise for years in the future in many instances. [2nd Supp CR 758] Despite the assertions in his affidavit and attached expert report that do not include discount rates for RV's liabilities, Burchett admitted in his deposition that a

fair valuation of RV's debts required application of the same or a similar discount rate as was applied to the assets. [2nd Supp CR 762] *See Robinson*, 923 S.W.2d at 557 (unreliable expert opinions inadmissible). The Burchett valuation opinions are unreliable and inadmissible, and the trial court abused its discretion by overruling Poe's objections.

4.     <u>Reversible Error</u>

The trial court abused its discretion by overruling Poe's objections to the Espinosa and Burchett affidavits.   Had the trial court sustained the objections, the trial court would have been compelled to deny Espinosa's motion for partial summary judgment against Poe because, without the inadmissible evidence, Espinosa did not meet his summary judgment burden.   *See* Tex. R. App. P. 44.1(a).   All of Espinosa's TUFTA claims against Poe required that Espinosa prove, as a matter of law, the fair value of RV's assets, liabilities, and remaining assets following transfers to Poe, and these affidavits were central to Espinosa's attempt to do so.   *See* Tex. Bus. & Com. Code Ann. §§ 24.005(a), .006(a).

**Issue Three:** The trial court erred by rendering summary judgment for Espinosa on his TUFTA claim against Appellants because Espinosa lacked standing and because genuine issues of material fact existed for at least one element of each of Espinosa's TUFTA theories.

## A. Standard of Review

This court reviews a traditional summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). To obtain summary judgment, the movant must establish that there are no issues of material fact and that he is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex. 2005); *Nixon v. Mr. Prop. Mgmt.*, 690 S.W.2d 546, 548 (Tex.1985). "An appellate court reviewing a summary judgment must consider all the evidence in the light most favorable to the nonmovant, indulging every reasonable inference in favor of the nonmovant and resolving any doubts against the motion." *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 756 (Tex. 2007). The reviewing court "must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all the evidence presented." *Id.* at 755.

## B. Espinosa's Grounds for Summary Judgment under TUFTA

Espinosa's motion sought judgment as a matter of law against Poe under sections 24.005(a)(1), 24.005(a)(2)(A), 24.005(a)(2)(B), and

24.006(a) of the Texas Uniform Fraudulent Transfers Act. [2nd Supp CR 15-17] *See* Tex. Bus. & Com. Code Ann. §§ 24.005, .006.  Because there are several common elements to Espinosa's various theories, the common elements (and the fact issues remaining on those elements) are discussed together.

## C.  Espinosa Lacks Standing to Recover Investor Money

The summary judgment cannot stand because Espinosa does not have standing to recover the "investor money" he seeks.  Espinosa stated unequivocally in his motion for summary judgment that "[t]o date, the investors have received only $5.2 million of their own money back, while the Licensees collectively continue to hold more than $12 million of investor's money." [2nd Supp CR 3] Espinosa repeated this assertion in various forms throughout his motion and his live pleading.

Espinosa lacks standing to recover "investor money."  RV does not have an ownership interest in "investor money."  "Investor money" is not a corporate asset of RV that Espinosa has standing to recover in his capacity as receiver.  As this court held in *Akin, Gump, Strauss, Hauer and Feld, L.L.P. v. E-Court*, No. 03-02-00714-CV, 2003 Tex. App. LEXIS 3966 (Tex. App.—Austin May 8, 2003, no pet.) (mem. op.), a case relied upon heavily by the Receiver:

> But a receiver does not have an unfettered right to represent creditors and shareholders of a corporation. A receiver may represent creditors and shareholders only to the extent that the cause of action seeks to preserve or recover corporate assets.

*Id.* at *13.

> Whatever the status of the receiver's claims on behalf of "innocent investors," the law is clear that a receiver may represent creditors and shareholders only to the extent that the cause of action seeks to preserve or recover corporate assets, not individual assets.

*Id.* at *20.

Espinosa's repeated admissions that he seeks to recover "investor money" constitute judicial admissions that he lacks standing with regard to all of the claims on which he seeks summary judgment. "Assertions of fact in live pleadings are formal judicial admissions and summary judgment may be rendered on the pleadings when they contain judicial admissions." *White v. Cole*, 880 S.W. 2d 292 (Tex. App.—Beaumont 1994, writ denied) (citing *Manaham v. Meyer*, 862 S.W. 2d 130 (Tex. App.—Houston [1st Dist.] 1993, writ denied)). Espinosa's admissions destroy his standing and the trial court's subject matter jurisdiction. "Without standing, a court lacks jurisdictions to hear a case." *Austin Nursing Center, Inc. v. Lovato*, 171 S.W. 3d 845, 849. (Tex. 2005) (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W. 2d 440, 443 (Tex. 1993)).

All of Espinosa's claw-back claims seek recovery of what Espinosa admits is "investor money." The trial court erred by granting summary judgment on claims over which it had no jurisdiction.

## D. No Creditor has a Qualifying Claim under TUFTA

Section 24.005(a) requires that there be a creditor whose "claim arose before or within a reasonable time after the transfer was made or the obligation was incurred," and section 24.006(a) requires that there be "a creditor whose claim arose before the transfer was made or the obligation was incurred." Tex. Bus. & Com. Code Ann. §§ 24.005(a), .006(a). TUFTA defines "creditor" to mean "a person . . . who has a claim." *Id.* § 24.002(4). "Claim" is defined as "a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* § 24.002(3). This element is common to all TUFTA grounds asserted by Espinosa.

The "creditors" in this case are the participants who loaned money to RV for the purchase of life insurance policies. [2nd Supp CR 738-39] In his initial report to the trial court in this case, Espinosa defined the date on which RV participant-creditors had claims against RV, writing as follows:

> Each of the investments was structured as a loan to Retirement Value, whereby the investors provided Retirement Value with

> funds in exchange for Retirement Value's promise to pay a fixed sum of money at an undetermined date in the future. . . . *The date on which the insured under the policy died set the date that the investment matured and when Retirement Value would be required to repay the loan.* [2nd Supp CR 720] [Emphasis added.]

Espinosa repeated the italicized sentence in the fact section of his motion for summary judgment, [2nd Supp CR 4] and his description generally tracks the terms of the Loan Agreements signed by the participants. [2nd Supp CR 642-62] Espinosa has thus admitted, and the Loan Agreements provide, that the participants did not have a claim until the life insurance policies matured. [2nd Supp CR 720] Only if a life insurance policy matures and RV failed to pay a participant could there be a creditor claim by one of the participants. [2nd Supp CR 720, 642-62]

Espinosa and his attorneys made similar admissions that are reflected in other parts of the summary judgment record. At a September 27, 2011 bankruptcy hearing related to this case, Espinosa testified, "I think the documents speak for themselves, but if you want me to put a voice to them, the documents say that the notes mature upon the maturity of that policy." [2nd Supp CR 746] At an August 22, 2011 bankruptcy hearing, Espinosa's attorney stated both that "I think there are real issues as to whether debts were paid when due, 'due' being the key word here" and that "there is a significant issue as to whether Retirement Value is paying debts

42

as they come due, considering that they're not really due." [2nd Supp CR 734] Similarly, Poe's affidavit in opposition to Espinosa's motion for summary judgment stated, in part, that his "clients were to receive their share of death benefits *when these policies matured.* Retirement Value would always be able to pay [his] clients their money back because the death benefits would be available when the policies matured." [2nd CR Supp 1031] [Emphasis added.]

Other evidence proffered by Espinosa showed that commissions were paid from the initial loan money given to RV by the participants, long before participant claims could arise. Wendy Rogers testified in her deposition that commission payments to licensees were made from the participants' initial loan proceeds to RV. [2nd Supp CR 205] Commission payments to Poe (i.e., the allegedly fraudulent transfers) were thus made at or shortly after the time that the participant transferred the initial loan proceeds to RV. [2nd Supp CR 3, 6] As described above, however, participants do not have "claims" against RV until a policy matures and RV fails to pay the promised return under the Loan Agreements. [2nd Supp CR 642-62, 720, 734, 746] Therefore, there are no creditors whose "claim arose *before or within a reasonable time* after the transfer was made or the obligation was incurred" or creditors "whose claim arose *before the transfer*

43

was made or the obligation was incurred" because creditor claims arise long after Poe's commissions were paid to him by RV. Tex. Bus. & Com. Code Ann. §§ 24.005(a), .006(a) (emphasis added).

Viewed in the light most favorable to Poe, the evidence presented a genuine issue of material fact on an element common to each of Espinosa's TUFTA claims against Poe under sections 24.005(a) and 24.006(a) of the Texas Business and Commerce Code. Because all four grounds for summary judgment rely on this element, the trial court erred by granting summary judgment for Espinosa on his TUFTA claims against Poe.

## E.  Insufficient Evidence of Insolvency

### 1.  Insolvency

Espinosa's claim under section 24.006(a) required Espinosa to prove as a matter of law that the transfer of commissions to Poe occurred when RV was insolvent or that RV "became insolvent as a result of the transfer or obligation." Tex. Bus. & Com. Code Ann. § 24.006(a). TUFTA provides that a "debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a *fair valuation*." *Id.* § 24.003(a) (emphasis added).

To put Espinosa's insolvency argument into perspective, Poe received commissions totaling $485,564.13. However, Espinosa told the trial court that RV had, at the time of the receivership, assets totaling more than $179 million ($154 million in life insurance policies and $25 million in cash and securities) and had obtained loans totaling $77 million from participants. [2nd Supp CR 92-93] The receivership estate had about $29 million in cash in August 2011. [2nd Supp CR 734-38] Payment of commissions to Poe did not render RV insolvent.

Poe's affidavit presented genuine issues of material fact on this element of Espinosa's TUFTA claim. Poe's affidavit provided, in relevant part, that his "clients were to receive their share of death benefits when [the life insurance] policies matured. Retirement Value would always be able to pay [his] clients their money back because the death benefits would be available when the policies matured." [2nd Supp CR 1031] Poe also explained that "[l]inking the obligation to pay participants to the maturity date of the policies ensured that Retirement Value would always be able to pay its debts as they came due" and that "the value of Retirement Value's assets were equal to or greater than its liabilities because the life settlement program assets and liabilities offset each other, at worst, and Retirement Value always had other assets." [2nd CR Supp 1031]

In addition, Espinosa's summary judgment evidence was internally inconsistent, not credible, and insufficient to establish his entitlement to judgment as a matter of law. For example, he argued that paying commissions affected RV's ability to deliver the promised return to the participants and that paying the commissions rendered RV incapable of paying the participants as promised. [2nd Supp CR 17] This is wrong. RV promised to purchase life insurance policies and to pay the participants the death benefits on the policies when they matured. [2nd Supp CR 720, 642-62] Payment of commissions did not affect RV's promise to the participants or its ability to satisfy its obligation to the participants to pay them the death benefits when the policies matured because RV never had an obligation to reserve premiums sufficient to cover all insurance policies through maturity. [2nd Supp CR 642-62] The participants were obligated to contribute once the initial premium reserves were exhausted, and the participants' additional premiums would keep the policies in effect. [2nd Supp CR 645] Then, and only then, the death benefits on the policies themselves (with face value of $130 million) provided the funds to pay the participants as the policies matured. [2nd Supp CR 720, 645] That framework existed independent of any commission payment to Poe, and payment of commissions to Poe did not render RV insolvent. The trial court therefore

46

erred by granting summary judgment against Poe on the ground that commission payments to him rendered RV insolvent. *See* Tex. Bus. & Com. Code Ann. § 24.006(a).

There are also genuine issues of material fact as to whether RV was ever insolvent. Espinosa's insolvency evidence is legally insufficient (or sufficiently controverted to avoid summary judgment) for several reasons. First, as argued above, the trial court should have excluded several parts of the Espinosa and Burchett affidavits, without which Espinosa failed to meet his burden as the summary judgment movant.

Second, Espinosa's summary judgment evidence on insolvency is internally inconsistent and is contradicted by Poe's summary judgment evidence. Espinosa has testified by affidavit that RV had $29 million on deposit and current trade payables of less than $100,000. [2nd Supp CR 55] Moreover, Espinosa and his counsel made representations to the bankruptcy court about RV's solvency and ability to pay its debts when due. At a September 27, 2011 hearing, Espinosa testified that "the documents say that the notes mature upon the maturity of that policy." [2nd Supp CR 746] Espinosa's counsel made several statements regarding RV's solvency at an August 22, 2011 bankruptcy hearing:

- I think there are real issues as to whether debts were paid when due, "due" being the key word here. [2nd Supp CR 734]

47

- [T]here is a significant issue of whether Retirement Value is paying debts as they come due, considering they're not really due. [2nd Supp CR 734]

- When we're talking about the creditors, by and large, 99.9 percent are these note holders. There are a couple out there. There's a lease, there's a couple things. All told, not $100,000. [2nd Supp CR 738]

- There are 48 policies. We've got about $30 million in cash. [2nd Supp CR 736]

- We've got a plan of payment that was proposed on the eve of adoption. It will pay somewhere between 80 cents and 120 cents of [the participants'] investment amount, which is unheard of. [2nd Supp CR 735]

- They've determined that in 97-1/2 of all likely scenarios – actually, of all scenarios – it will take $19 million in reserves to carry us to the end of the policies. Now, that involves using maturities from earlier policies to pay premiums on other policies. And we have $29 million, so that leaves a fair amount of excess money, which we were planning to distribute this year. [2nd Supp CR 736]

- So we were on the cusp of approving a plan that would get everyone paid, we think, in full. [2nd Supp CR 737]

- And frankly, had the plan been adopted, we'd be done, largely. Once the plan is adopted, what we would be left with doing is supervising contingency counsel who are off suing a bunch of people, collecting on these insurance claims and cutting checks, once we got through a very quick and I think relatively painless proof of claim process. [2nd Supp CR 735]

Espinosa's counsel thus represented to the bankruptcy court that RV had forty-eight life insurance policies and about $30 million in cash, that

Espinosa needed about $19 million in cash to pay for all of the policies through maturity, that the creditor's claims are not yet due, and that there is sufficient cash in reserve to hold all life insurance policies to maturity and pay all participants their money back "in full." [2nd Supp CR 734-38] Yet, the trial court granted summary judgment on the ground that RV was insolvent. Viewed in the light most favorable to Poe, there are fact issues regarding RV's insolvency because RV had sufficient reserves to allow participants to be repaid in full in 97.5% of all scenarios. [2nd Supp CR 736]

Espinosa also failed to establish insolvency based on the fair value of RV's assets and liabilities. Espinosa presented no evidence of the fair value of RV's assets or the fair value of RV's liabilities, particularly since many of the liabilities are not yet due. As argued above, neither Espinosa nor his retained expert, Burchett, are qualified to testify about fair valuation of RV's assets and liabilities. Moreover, as Espinosa admitted in his bankruptcy court testimony, the receivership changed everything. [2nd Supp CR 744-46] The face value of RV's debts dropped to about $77 million because the participants are limited to the return of their investments. [2nd Supp CR 614, 608-625] Participants have no other claims against RV beyond a pro rata claim to the combined death benefits of all policies. [2nd Supp CR 614, 608-25] Espinosa and his counsel have stated that the

49

participants will recover "in full" what they invested and it is more than likely that they will receive additional sums, depending on the obvious element that was always the predominate element – the dates on which the insureds pass. [2nd Supp CR 736-37, 746] The participants are better off than they were prior to the receivership because they will not have to meet any premium calls despite the language of their Loan Agreements that required as much. [2nd Supp CR 645]

Even if this Court considers it, Burchett's affidavit lacks credibility and was insufficient to sustain Espinosa's burden as summary judgment movement. Burchett testified in his deposition that he has no prior experience with life settlements or viaticals; [2nd Supp CR 750] that he has no experience calculating life expectancies; [2nd Supp CR 750] that he is not familiar with the methodology used to calculate life expectancy; [2nd Supp CR 751] that he would not be able to vouch for and state that someone else's life expectancy calculation is accurate because this is not his area of knowledge, experience, or expertise; [2nd Supp CR 751] that he relied on the value of the life insurance policies as provided by the firm of Lewis & Ellis; [2nd Supp CR 752] that he did not verify the work they did; [2nd Supp CR 753] that he is aware that Lewis & Ellis obtained life expectancy estimates from another firm; [2nd Supp CR 754] and that he

does not know what, if anything, Lewis & Ellis did to verify this information. [2nd Supp CR 754]

In order to perform a solvency analysis, Burchett was required to determine the fair value of the assets and liabilities of RV. His valuation analysis did not comply with the AICPA Statement of Standards for Valuation Services No. 1. [2nd Supp CR 755] Whereas a true solvency opinion (according to the AICPA Standards) "does not mention the word value and does not conclude a number of any kind," Burchett's Report includes numbers and uses the word "value" many times. [2nd Supp CR 756] Contrary to AICPA Standards, Burchett's Report lists what he claimed to be RV's monthly net asset value. [2nd Supp CR 756]

Despite minimal testing and verification of Lewis & Ellis's work, Burchett integrated Lewis & Ellis's decision to apply the enormous 20% discount rate to the face amounts of RV's insurance policies while applying no discount rate whatsoever to RV's liabilities. Burchett conceded that he relied on Lewis & Ellis's work substantially and that the 20% discount rate he used was Lewis & Ellis's decision. [2nd Supp CR 757, 753] Lewis & Ellis, in turn, conceded that "[t]he discount rate is an assumption that drastically affects the result of the actuarial value in [its] analysis." [2nd Supp CR 730] Use of this discount rate purportedly reduced the value of the RV insurance

51

portfolio from $130 million to around $5 million. [2[nd] Supp CR 758] Applying the gargantuan 20% discount rate reduced the purported value of RV's assets by more than 95%, yet Burchett applied no discount rate to RV's stated $77 million obligation to the participants, despite the fact that these amounts are not payable until the death of the insureds, which is projected to occur years in the future. [2[nd] Supp CR 758]

In light of these obvious discrepancies, Burchett admitted in his deposition that he likely should have applied the same discount rate to RV's liabilities as he applied to the face amount of the insurance policies. [2[nd] Supp CR 762] Burchett also conceded in his deposition that in order to determine fair value, one must determine what a willing buyer would pay and what a willing seller would accept for an asset or liability. [2[nd] Supp CR 761] Burchett admitted that, on the open market, the liability represented by the obligation to the participants would be discounted and that the fair value of the liability was different from what he represented in his report.[13] [2[nd] Supp CR 761] He admitted that under the Policy Participation Agreements, no amounts would be due to the participants until the policies matured upon the death of the insured. [2[nd] Supp CR 758-60] He admitted that at policy maturity, RV would receive the face amount of the policy and would

---

[13] This concession alone created a fact question regarding the value of RV's liabilities, which in turn leaves a fact question about whether RV was insolvent.

52

have more than enough money to pay his stated liability to the participants ($77 million). [2nd Supp CR 758] Burchett agreed that at policy maturity, there would be equal cash flow in (to RV from the policy) and out (to the participants for payment based on the same event). [2nd Supp CR 761-62]

Burchett also acknowledged that he did not perform any calculation to see if applying a 20% discount rate to RV's liabilities would render RV solvent under his analysis. [2nd Supp CR 763] He admitted that if application of the discount rate reduced the liability by more than $50 million, the company would be solvent (even applying the 20% discount rate to RV's assets). [2nd Supp CR 763-64] He also admitted that if no discount rate were applied to the cash flow from the policies, which would be consistent with his failing to apply a discount rate to the cash flow of payments to the participants, RV would be solvent. [2nd Supp CR 765] Similarly, had Burchett reduced RV's liabilities by 95% as he had done with the 95% reduction in RV's assets, the liabilities would equal $3.8 million, less than RV's assets (even at Burchett's steeply-discounted value), meaning RV was not insolvent.

Burchett's affidavit is incompetent summary judgment evidence and should have been stricken. Even so, Poe's response controverted the affidavit testimony and revealed, through Burchett's own deposition

testimony, the credibility issues that must only be resolved by a jury, not the trial court on summary judgment. *See Huckabee v. Time Warner Entertainment Co. L.P.*, 19 S.W.3d 413, 422 (Tex. 2000) ("Texas law has always emphasized that trial courts must not weigh the evidence at the summary judgment stage. Instead, a trial court's only duty at the summary judgment stage is to determine if a material question of fact exists."); *Casso v. Brand*, 776 S.W.2d 551, 558 (Tex. 1989) ("If the credibility of the affiant or deponent is likely to be a dispositive factor in the resolution of the case, then summary judgment is inappropriate."). Viewing the evidence in the light most favorable to Poe, Burchett's unexplained conclusions, deposition concessions, and internal inconsistencies (which raise serious credibility issues) presented genuine issues of material fact as to the alleged fair value of RV's assets and liabilities.

Espinosa's affidavit opinion is similarly problematic. The affidavit fails to establish any expert witness qualifications, and it is conclusory. Espinosa starts with the assertion that: "Retirement Value is insolvent." [2nd Supp CR 55] This is a conclusory statement that is not probative. Espinosa then states: "The market value of the assets [RV] holds is far less than its debts." [2nd Supp CR 55] This statement, too, is an unsupported and impermissible conclusion. It is also wrong. Because the primary assets

consist of the life insurance policies (with face value of more than $130 million) that will be held to maturity and used to fund the Plan of Distribution that will make the participants whole, the enormously discounted present value of these policies is irrelevant. [see 2nd Supp CR 608-25] The Plan of Distribution adopted by the trial court provides that all of the policies will be held to maturity. [2nd Supp CR 608-25] There is no intention to sell these policies, and their market value has no bearing on the implementation of the Plan of Distribution. Thus, any purported analysis of the value of the policies if sold to "bottom feeders" on the open market is irrelevant.

Espinosa's affidavit testimony regarding market value also contradicts his own reports to the trial court:

> Unfortunately, there is no easily available market price for life settlement insurance policies. Unlike stocks, bonds and commodities, there is no public exchange for insurance policies. Each sale takes place in private between a single buyer and a single seller. The sales price is generally confidential and, in any event, there is no centralized database for sales of life insurance policies, such as there is for real estate. Accordingly, it is not generally possible to determine the market price for an insurance policy based on sales of comparable policies. [2nd Supp CR 728]

On the next page of the same Report, after summarizing the figures provided to him by others (portfolio market value between $5.3 and $8.3 million), Espinosa admits that: [T]he Receiver is not faced with a 'buy' decision, but rather whether to sell or to hold. Accordingly, *the value of*

*these policies to the estate is potentially much higher.*" [2nd Supp CR 728] [Emphasis added.] This evidence alone creates a genuine issue of material fact on the value of RV's assets because it contradicts Espinosa's asserted value of RV's assets.

Espinosa, in his affidavit, continued: "Retirement Value owes $125.1 million in debt. Almost all of this debt is owed to the investors -- $77.6 million in principal and $47.2 million in interest." [2nd Supp CR 55] These statements are no longer true, if they ever were. The Plan of Distribution provides for the participants' sole remedy against RV through the "hold to maturity" process. [2nd Supp CR 608-25] RV does not owe $125.1 million in debt. Again, there are fact issues as to RV's alleged debt.

Finally, Espinosa states: "To pay these debts Retirement Value has approximately $29 million in cash and a portfolio of policies with an estimated liquidation value of $5.7 million." [2nd Supp CR 55] These statements, too, are no longer true, if they ever were. The death benefits from the policies will fund the Plan of Distribution. [2nd Supp CR 608-25] The cash on hand at any point in the receivership was more than sufficient to pay the incidental debts of the receivership. Espinosa's counsel said as much to the bankruptcy court in 2011, representing to the bankruptcy judge that RV had cash of about $29 million and that RV needed only $19 million

in policy reserves to hold all insurance policies to maturity and repay the participants "in full." [2nd Supp CR 734-38] These representations are material evidence that RV's debts do not exceed its assets.

Espinosa's evidence is insufficient to establish that RV was insolvent at the time the commissions were paid to Poe or that RV was ever insolvent. The evidence was also contradicted in all material aspects. Viewing the evidence in the summary judgment record in the light most favorable to Poe, as this Court is required to do, there are genuine issues of material fact on the insolvency element of Espinosa's TUFTA claim under section 24.006(a). The trial court therefore erred by granting summary judgment for Espinosa on his TUFTA claim against Poe.

### 2. Value of Remaining Assets

Espinosa's claims under sections 24.005(a)(2)(A) and (B) required Espinosa to prove as a matter of law that, as a result of the commission transfers to Poe, "the remaining assets of [RV] were unreasonably small in relation to [RV's] business or transaction" or that RV, as a result of the commission transfers to Poe, incurred or would incur "debts beyond [RV]'s ability to pay as they became due." *Id.* § 24.005(a)(2)(A) and (B). These grounds for summary judgment fail for many of the same reasons that Espinosa's insolvency argument fails, and Poe incorporates the insolvency

57

arguments above as if set forth fully herein. The record in this case conclusively establishes that RV had $29 million in cash, millions of dollars in insurance policies, and sufficient reserves to pay policy premiums on all policies through maturation. [2nd Supp CR 734-38]

In addition, Poe's affidavit presented genuine issues of material fact on this common element of Espinosa's claims. That affidavit provided, in relevant part, that

> Retirement Value paid for the policies that my clients participated in. My clients were to receive their share of death benefits when these policies matured. Retirement Value would always be able to pay my clients their money back because the death benefits would be available when the policies matured.

> Linking the obligation to pay participants to the maturity date of the policies ensured that Retirement Value would always be able to pay its debts as they came due. This linking also ensured that the value of Retirement Value's assets were equal to or greater than its liabilities because the life settlement program assets and liabilities offset each other, at worst, and Retirement Value always had other assets. [2nd CR Supp 1031]

This evidence, and the evidence discussed above relating to RV's alleged insolvency and the fair value of RV's assets and liabilities, when viewed in the light most favorable to Poe, presented genuine issues of material fact as to whether RV had, as a result of paying commissions to Poe, insufficient remaining assets or debts beyond RV's ability to pay. *See* Tex. Bus. & Com. Code Ann. §§ 24.005(a)(2)(A), (B), .006(a). The trial

court therefore erred by granting summary judgment for Espinosa on his TUFTA claims against Poe.

## F.     Reasonably Equivalent Value

There are also fact issues on an element common to Espinosa's claims under TUFTA sections 24.005(a)(2)(A) and (B) and section 24.006(a) because those claims require that RV did not receive "reasonably equivalent value in exchange for the transfer or obligation." Tex. Bus. & Com. Code Ann. §§ 24.005(a)(2)(A), .006(a). "Reasonably equivalent value" is defined in section 24.004 to "include[] without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction." *Id.* § 24.004(d).

Poe's affidavit, attached to his summary judgment response stated,

> The commissions on the Retirement Value products (in my case 10%) were not unusual because the nature of the product as an illiquid product meant that my client's funds would not be available for reinvestment for several years. Based on my experience, illiquid products tend to pay higher commissions compared to managed funds, for example, which typically pay lower commissions on an annual basis. The 10% commission would be comparable to receiving a lower fee on an annual basis for the period of illiquidity of the life settlement product. Also, the payment of the commissions did not affect in any way the outcome of the transaction for my clients because they would receive their share of the death benefit when the policies in which they participated matured. [2[nd] CR Supp 1030]

Poe's affidavit also provided,

> I earned the commissions I was paid because I identified potential participants, I presented the Retirement Value product to them as I had been instructed by Retirement Value, I answered their questions, I helped them fill out the paperwork, I submitted their paperwork to Retirement Value for approval, and I served as a liaison between my clients and Retirement Value. These efforts were valuable and their value was equivalent to the commissions I received. If I had sold other life settlement products to my clients who participated in the Retirement Value program, I would have received similar commissions. My Licensee Agreement provided that I would receive the commissions I received. Retirement Value paid these commissions voluntarily with knowledge of all material facts because it was Retirement Value's product and Retirement Value's life settlement program. [2nd CR Supp 1030-31]

Viewed in the light most favorable to Poe, this evidence presented genuine issues of material fact on the reasonably equivalent value element of Espinosa's TUFTA claims under sections 24.005(a)(2)(A) and (B) and 24.006(a). The trial court erred by granting Espinosa's motion for summary judgment under sections 24.005(a)(2)(A) and (B). *See* Tex. Bus. & Com. Code Ann. §§ 24.005(a)(2)(A), (B), .006(a).

## G. Actual Intent

Espinosa's final argument for summary judgment against Poe is under section 24.005(a)(1). Espinosa's only "evidence" to support this argument is the summary judgment order in favor of the State and against RV (which Espinosa did not contest) in which the trial court determined that

60

RV committed securities fraud. [2nd Supp CR 15] Espinosa relied only on a Ponzi scheme case to argue that every transfer made by RV was therefore fraudulent under TUFTA. [2nd CR Supp 15] The trial court did not, however, grant summary judgment for Espinosa on his Ponzi scheme allegation for the automatic return of commissions. The summary judgment order is limited to Espinosa's TUFTA claims and does not include the affirmative Ponzi scheme finding that Espinosa sought in his motion. [2nd Supp CR 13] The summary judgment cannot be affirmed on that ground. *See State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 380 (Tex. 1993) (declining to consider a ground for summary judgment not contained in trial court's order granting summary judgment on specific grounds).

In addition, as discussed above, this claim fails because there are no "creditors" with "claims" that "arose before or within a reasonable time after the transfer was made or the obligation was incurred" since the participants do not have claims against RV until the insurance policies mature. Tex. Bus. Com. Code Ann. § 24.005(a)(1). It also fails because Espinosa wholly failed to show that a transfer *to Poe* was made with intent to defraud. Under Espinosa's steamroller approach, even the receptionist at RV must return all of her salary payments because every single transfer from RV was made with intent to defraud. Texas law requires more. To be entitled

to judgment against Poe, Espinosa must prove that a transfer *to Poe* was made with intent to defraud, and Espinosa did not even attempt to do so. The trial court erred to the extent it granted summary judgment for Espinosa under section 24.005(a)(1).

## H. Ponzi Scheme Allegations

The trial court did not include a finding in the summary judgment order that RV was operated as a Ponzi Scheme and that Poe was therefore required to return his commissions as a matter of law. [CR 1973-74] In relevant part, Espinosa's motion for summary judgment stated:

> In the present case, Retirement Value was either a Ponzi scheme or, at the very least, quickly on its way to becoming one. Therefore, the Licensees have to return their commissions as a matter of law. *In the alternative*, even if it was not technically a Ponzi scheme, *the elements of fraudulent transfer* and money had and received *are met as a matter of law*. [2nd CR Supp 13] [Emphasis added.]

Espinosa clearly requested, independent of his TUFTA claim, a Ponzi-scheme finding from the trial court, but there is no such finding within the trial court's order granting summary judgment on only the TUFTA-specific grounds, a ground upon which Espinosa sought relief in the alternative to his Ponzi scheme allegation. [CR 1973] *See State Farm Fire & Cas. Co.*, 858 S.W.2d at 380 ("[I]n this case, the trial court's order explicitly specifies the ground relied on for the summary judgment ruling; thus, the summary

judgment can only be affirmed if the theory relied on by the trial court is meritorious, otherwise the case must be remanded."). The Ponzi scheme arguments in Espinosa's motion are therefore not a ground on which this Court can affirm the summary judgment.

In an abundance of caution, however, Poe also challenges Espinosa's Ponzi scheme argument and contends that fact issues prevented the trial court from granting summary judgment on that ground.

Ponzi schemes, named after their infamous creator Charles Ponzi, have as their defining characteristics the complete absence of underlying assets and the use of subsequent investor's funds to pay prior investors. "A 'Ponzi scheme' is an investment fraud wherein investors are enticed with the promise of extremely high returns or dividends over a short period of time." *Goldstein v. Morrison,* 113 S.W. 3d 769, 773 (Tex. App.—Austin 2003, no pet.) (citing *Gutierrez v. Cayman Is. Firm of Delloitte & Touche*, 100 S.W. 3d 261, 266 (Tex. App.—San Antonio 2002, no pet.). "Investors are paid 'from monies obtained from later investors rather than from profits of the underlying business venture." *Id.* at 773 (citing *Caldwell v. State*, 95 S.W. 3d 563, 566 (Tex. App.—Houston [1st Dist.] 2002, no pet.).

That is not the case here, and Espinosa's reports to the trial court (and the other summary judgment evidence in the record) shows that RV

was not operated as a Ponzi scheme because RV used participant funds to purchase life insurance policies, and the participants were repaid on their investments from the proceeds of those investment funds, not from other investors' money. [2nd Supp CR 75] Espinosa himself testified that he had never referred to RV as a Ponzi scheme. [2nd Supp CR 583]

To the extent it is relevant to this appeal, and to the extent the trial court ordered via summary judgment that Poe must return his commission payments from RV because RV operated as a Ponzi scheme, the trial court erred by granting summary judgment on that ground.

## PRAYER

Appellants Poe and SRP respectfully request that the Court, after properly applying the one-satisfaction rule as the trial court failed to do, reverse the trial court's judgment in its entirety and render a take-nothing judgment against Espinosa for all of his claims against Poe and SRP. Alternatively, Appellants Poe and SRP pray that the Court reverse the trial court's judgment and remand for a new trial in light of the genuine issues of material fact that should have precluded the trial court from granting Espinosa's motion for summary judgment. Finally, Appellants Poe and SRP generally pray for rendition of judgment in their favor, or alternatively,

for remand for a new trial, based on any ground asserted within this brief should this Court deem a remand necessary or appropriate.

Respectfully submitted,

**ALDRICH PLLC**

_____
Scott Lindsey
State Bar No. 24036969
slindsey@aldrichpllc.com
1130 Fort Worth Club Tower
777 Taylor Street
Fort Worth, Texas 76102
Telephone:  817-336-5601
Telecopier:  817-336-5297

**ATTORNEYS FOR APPELLANTS JAMES POE AND SENIOR RETIREMENT PLANNERS, LLC**

## CERTIFICATE OF COMPLIANCE

I certify that this brief was produced on a computer using Microsoft Word and contains 14,621 words, as determined by the computer software's word-count function, excluding the sections of the brief listed in Texas Rule of Appellate Procedure 9.4(i)(1).

_____
Scott Lindsey

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was delivered pursuant to Rule 21a, Tex. R. Civ. P., to all counsel or parties of record as shown below.

Dated this 11th day of March, 2015.

Via electronic service and e-mail:

John W. Thomas
jthomas@gbkh.com
John R. McConnell
jmcconnell@gbkh.com
George, Brothers, Kincaid & Horton, L.L.P.
114 W. Seventh, Suite 1100
Austin, TX 78701-3015
**ATTORNEYS FOR APPELLEE**

_____
Scott Lindsey

NO. 03-14-00518-CV

IN THE COURT OF APPEALS
THIRD DISTRICT OF TEXAS
AUSTIN, TEXAS

JAMES POE AND SENIOR RETIREMENT PLANNERS, LLC, Appellants

vs.

EDUARDO S. ESPINOSA, IN HIS CAPACITY AS RECEIVER OF
RETIREMENT VALUE, LLC, Appellee

APPELLANTS' APPENDIX

I.      Summary judgment order [CR 1973] ...........................................Tab 1

II.     Final Judgment [1st Supp CR 3-5].................................................Tab 2

III.    James Settlement Agreement [CR 2023-2037] ...........................Tab 3

IV.     Stipulation [CR 1966-67]...............................................................Tab 4

V.      TUFTA Statutes ............................................................................Tab 5
        Tex. Bus. & Com. Code Ann. § 24.005................................................A
        Tex. Bus. & Com. Code Ann. § 24.006................................................B
        Tex. Bus. & Com. Code Ann. § 24.002................................................ C
        Tex. Bus. & Com. Code Ann. § 24.003................................................ D
        Tex. Bus. & Com. Code Ann. § 24.004................................................E

DC     BK13346 PG1739

NOTICE SENT: FINAL INTERLOCUTORY NONE

DISP PARTIES:_____

DISP CODE: CVD/CLS_____

REDACT PGS:_____

JUDGE GDT CLERK law    CAUSE NO. D-1-GV-10-000454

| | | |
|---|---|---|
| STATE OF TEXAS,<br>*Plaintiff,* | § <br>§ <br>§ <br>§ | IN THE DISTRICT COURT OF |
| v. | § <br>§ | |
| RETIREMENT VALUE, LLC, *ET AL*<br>*Defendants,* | § <br>§ <br>§ <br>§ | TRAVIS COUNTY, TEXAS |
| AND | § <br>§ | |
| JAMES SETTLEMENT SERVICES, LLC,<br>*ET. AL.*<br>*Third-Party Defendants* | § <br>§ <br>§ <br>§ | 126th JUDICIAL DISTRICT |

## ORDER ON RECEIVER'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LICENSEE DEFENDANTS

On the 30th day of October, 2013, came on for consideration the Receiver's Motion for Partial Summary Judgment as to Licensee Defendants and Supplement to his Motion for Partial Summary Judgment as to Third-Party Defendants' Deemed Admissions; and Licensees Estate Planning &Protection Services, Salvatore Magaraci, Niche Investments, Damien Pechacek, Shawn Cornett, Greg Chick, Alternative Solutions Insurance, Kenneth Franco, PC&S, James Poe, Senior Retirement Planners, David Rice, Dan Levin and Scott Schroeder's Motions for No-Evidence Motions for Summary Judgment as to All Claims of the Receiver. Having considered the motions and responses, the Court orders as follows:

1. The Court grants the Receiver's Motion for Partial Summary Judgment as to Licensee Defendants on the Receiver's claims under the Texas Uniform Fraudulent Transfer Act ("TUFTA") as to liability, damages and attorney's fees against Senior Retirement Planners, LLC, Estate Protection Planning Corp., Niche Investment Group, LLC, PC&S, LLC, David Rice, Kenneth Franco and Alternative Solutions Insurance Services, Inc.

1

2. The Court grants the Receiver's Motion for Partial Summary Judgment as to Licensee

Defendants on the Receiver's claims under the Texas Uniform Fraudulent Transfer Act as

to liability and attorney's fees against Scott Schroeder, Dan Levin, James Poe, Salvatore

Magaraci, Damien Pechacek, Shawn Cornett, and Greg Chick. At the hearing, the court

asked counsel for the parties to get together and attempt to reach a stipulation as to the

amount of commissions these defendants received directly or through their companies or

employers relating to Retirement Value with the understanding that judgment would be

entered against them as damages for the TUFTA claims.

3. The Court grants the motions for summary judgment filed by Estate Planning &

Protection Services, Salvatore Magaraci, Niche Investments, Damien Pechacek, Shawn

Cornett, Greg Chick, Alternative Solutions Insurance, Kenneth Franco, PC&S, James

Poe, Senior Retirement Planners, David Rice, Dan Levin and Scott Schroeder as to the

Receiver's claims of breach of fiduciary duty, conspiracy to breach fiduciary duty, aiding

and abetting breach of fiduciary duty, and breach of contract.

4. All other relief requested in these motions for summary judgment listed above is

DENIED.

Signed this ___10___ day of November, 2013

_____

The Honorable Gisela D. Triana,
Judge Presiding

- 2 -

AGREED AS TO FORM:

John W. Thomas
GEORGE, BROTHERS, KINCAID & HORTON LLP
114 W Seventh, Suite 1100
Austin, TX 78701-3015
Telephone: (512) 495-1400
Facsimile: (512) 499-0094

ATTORNEYS FOR RECEIVER

Bogdan Rentea
RENTEA & ASSOCIATES
505 W. 12th St., Suite 200
Austin, Texas 78701
(512) 472-6291
(512) 472-6278

ATTORNEYS FOR THIRD PARTY DEFENDANTS
ESTATE PLANNING PROTECTION AND MAGARICI

Robert L. Wright
ROBERT L. WRIGHT, P.C.
612 Eighth Avenue
Fort Worth, Texas 76104
Telephone: (817) 850-0082
Facsimile: (817) 870-9101

ATTORNEYS FOR THIRD-PARTY DEFENDANTS
SENIOR RETIREMENT PLANNERS, NICHE INVESTMENT GROUP, PC&S,
ALTERNATIVE SOLUTIONS INSURANCE SERVICES, FRANCO, RICE, POE,
PECHACEK, CORNETT AND CHICK

- 3 -

1975

Leslye E. Moseley
SESSIONS FISHMAN NATHAN & ISRAEL LLC
900 Jackson Street, Suite 440
Dallas, Texas 75202
(214) 741-3001
(214) 741-3055 fax
**ATTORNEYS FOR THIRD PARTY DEFENDANTS
LEVIN AND SCHROEDER**

- 4 -

Notice sent: Final Interlocutory None

Disp Parties:

Disp code: CVD / CLS

Redactions:

Judge ___ Clerk ___

DC        BK14153 PG1098        Filed in The District Court
                                      of Travis County, Texas

D-1-GN-14-001582        MAY 28 2014 BH
                              At _____ 4:00 P __ M.
                              Amalia Rodriguez-Mendoza, Clerk

CAUSE NO. _

| | | |
|---|---|---|
| EDUARDO S. ESPINOSA, IN HIS CAPACITY AS RECEIVER OF RETIREMENT VALUE, LLC, *Plaintiff*, | § § § § § | IN THE DISTRICT COURT |
| v. | § § | OF TRAVIS COUNTY, TEXAS |
| JAMES POE AND SENIOR RETIREMENT PLANNERS, LLC *Defendants*. | § § § § | 200th JUDICIAL DISTRICT |

## JUDGMENT AS TO DEFENDANT JAMES POE AND SENIOR RETIREMENT PLANNERS, LLC

On the 30th day of October, 2013, came on to be heard Receiver's Motion for Partial Summary Judgment as to Licensee Defendants. The Court granted the motions in all respects on the claims asserted by the Receiver under the Texas Uniform Fraudulent Transfer Act ("TUFTA") as to Senior Retirement Planners, LLC. The Court granted the motions as to liability and attorney's fees as to claims asserted under TUFTA as to James Poe, with the understanding that judgment would be entered against him for damages equal to the amount of commissions he received directly or through his company or employer relating to Retirement Value. The parties subsequently stipulated as the amount of commissions received by James Poe but did not stipulate that these sums are recoverable as damages under the TUFTA theory of recovery asserted by the Receiver upon which the Court has indicated she would grant summary judgment or under any other theory of recovery asserted by the Receiver. It is, therefore ORDERED AND ADJUDGED as follows:

1

3

The Court hereby RENDERS judgment for Eduardo S. Espinosa, in his capacity as Receiver of Retirement Value, LLC ("Receiver") against Defendants James Poe and Senior Retirement Planners, LLC("Defendants").

The Court finds that the Receiver is entitled to actual damages, pre-and post-judgment interest and court costs. In addition, the Receiver is entitled to reasonable and necessary attorney's fees pursuant to Section 24.013 of the Texas Business & Commerce Code.

Accordingly, the Court orders that the Receiver recover the following:

1. From Senior Retirement Planners, LLC and James Poe, jointly and severally, $485,564.13 in actual damages, prejudgment interest from August 12, 2011 at a rate of 5% until the date of this judgment, court costs, and post judgment interest on the above from today until paid at a rate of 5% compounded annually. In addition, the Receiver shall also recover from Senior Retirement Planners, LLC and James Poe, jointly and severally, reasonable and necessary attorney's fees of $182,086.55, which is 37.5% of actual damages awarded. Post judgment interest shall also accrue on the award of attorney's fees from today until paid at a rate of 5% compounded annually.

The Court further orders that if one or more Defendants herein unsuccessfully appeal this judgment to an intermediate court of appeals, the Receiver will additionally recover from such Defendants, jointly and severally, the amount of $7,142.86, representing the anticipated reasonable and necessary fees and expenses that would be incurred by the Receiver in defending the appeal.

The Court further orders that if one or more Defendants herein unsuccessfully appeal this judgment to the Texas Supreme Court, the Receiver will additionally

2

4

recover from such Defendants, jointly and severally, the amount of $2,142.86 in the event a petition for discretionary review is filed but the Texas Supreme Court denies review, or $4,285.71 in the event a petition for discretionary review is filed and the Texas Supreme Court grants review. Such amounts represent the anticipated reasonable and necessary fees and expenses that would be incurred by the Receiver in defending the appeal.

This judgment in this newly-severed cause is final, disposes of all claims and all parties, and is appealable.

All relief not expressly granted herein is denied.

SIGNED on the _28_ day of _May_ , 2014.

_____
HONORABLE JUDGE GISELA TRIANA

APPROVED AS TO FORM ONLY:


_____
Robert L. Wright
Attorney for Defendants James Poe
And Senior Retirement Planners, LLC

3

5

| | | |
|---|---|---|
| STATE OF TEXAS,<br>     *Plaintiff,* | §<br>§ | IN THE DISTRICT COURT OF |
| v. | §<br>§ | |
| RETIREMENT VALUE, LLC,<br>ET AL., | §<br>§<br>§ | |
|      *Defendants,* | §<br>§ | TRAVIS COUNTY, TEXAS |
| JAMES SETTLEMENT SERVICES, LLC,<br>ET AL. | §<br>§<br>§ | |
|      **Third-Party Defendants** | § | 126th JUDICIAL DISTRICT |

## SETTLEMENT AGREEMENT AND RELEASE OF ALL CLAIMS

THIS SETTLEMENT AGREEMENT AND RELEASE OF ALL CLAIMS ("Agreement") is made and entered into by and between Retirement Value, LLC ("RV"), Hill Country Funding, LLC (Texas), Hill Country Funding, LLC (Nevada) (the two Hill Country Funding entities are collectively referred to as "HCF"), Eduardo S. Espinosa in his capacity as Receiver of RV ("Espinosa"), Janet Mortenson in her capacity as the Special Receiver for RV ("Mortenson"), Don Taylor in his capacity as the Receiver for HCF ("Taylor"), and the State of Texas (collectively "Plaintiffs") and Third Party Defendants Ronald James, Donald James, and James Settlement Services, LLC (collectively, the "James Parties") and Michael Beste ("Beste").

WHEREAS, Plaintiffs (except for Mortenson) asserted various claims against the James Parties and Beste in a lawsuit styled *State of Texas v. Retirement Value, LLC, et. al.*, Cause No. D-1-GV-10-000454, in the 126th District Court, of Travis, County, Texas (the "Cause No. D-1-GV-10-000454");

WHEREAS, the James Parties and Beste deny having any liability for those claims; and

WHEREAS, the James Parties and Beste brought cross-claims and counter-claims against various parties; and

WHEREAS, Plaintiffs, the James Parties and Beste desire to avoid further litigation, preparation and expense; to terminate all past, present and potential controversies between Plaintiffs, the James Parties and Beste that were brought and/or that could have been brought in Cause No. D-1-GV-10-000454, and that arise out of all operations and activities of RV or HCF, against each other and all of their respective counsel, agents, etc. with prejudice; and

WHEREAS, Plaintiffs, the James Parties and Beste have agreed to resolve all claims that they have or may have against each other which were or could have been asserted in the Lawsuit, and that arise out of all operations and activities of RV or HCF, without admission by any party of the merits of the claims, demands, charges, and/or contentions of the others; and



WHEREAS, Plaintiffs, the James Parties and Beste covenant and warrant that they have not assigned, transferred, or subrogated any portion of any claim which they have against each other, other than to their attorneys of record, and further warrant that the undersigned are authorized to act in the capacities indicated:

NOW, THEREFORE, in consideration of the mutual promises and the covenants set forth herein, other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and in full compromise, release, settlement, accord and satisfaction, and discharge of all claims or causes of action, known or unknown, which were brought and/or that could have been brought in the Lawsuit, and that arise out of all operations and activities of RV or HCF, Plaintiffs, the James Parties and Beste covenant and agree as follows:

1. Monetary Consideration. Ronald James, Donald James, James Settlement Services, LLC ("JSS") and Michael Beste ("Beste") agree to pay Espinosa $3.4 million on or before April 25, 2013, and an additional $1.1 million on or before July 31, 2013, and an additional $1 million on or before October 31, 2013. The James Parties and Beste will receive a $100,000.00 discount off of the October payment if the payment is made by July 31, 2013, to be applied pro-rata to any amount of early payment less than the full $1 million. The payments shall be made by wire transfer to the IOLTA trust account of George & Brothers, LLP. Wiring or routing instructions will be provided to counsel for the James Parties by counsel for the Receiver reasonably promptly after the execution of this Agreement. Attorneys for Espinosa, George, Brothers Kincaid & Horton, LLP, agree to hold any payment in trust until the trial court judge approves this settlement. This settlement is expressly conditioned on and subject to court approval. In the event it is not approved, all payments will be returned to the James Parties and Beste.

2. Agreed Judgment: The parties will have an agreed judgment in the form attached hereto as Exhibit A signed by the judge, but not filed, in the amount of $8 million against the James Parties and Beste jointly and severally to secure the payments set out above in paragraph 1. The original copy of the judgment signed by the Court will be held by Espinosa, one copy will be held by counsel for Espinosa, and one copy will be held by Taylor. Except as provided herein, no copies of the judgment will ever be made, and no copies of the judgment will ever be disseminated and/or provided to any other person(s) and/or entities. If any payment is not timely made, counsel for Espinosa shall provide notice via e-mail to counsel for the James Parties and Beste. The James Parties and Beste shall have five (5) business days to cure the payment failure. If the payment failure is not timely cured, the judgment may be filed and abstracted immediately. The James Parties and Beste agree not to challenge the filing and enforcement of the judgment if payments are not timely made, notice has been provided, and the payment failure has not been cured, but reserve their right to challenge the amount due under the judgment based on offsets or credits allowed by this Agreement. The James Parties and Beste shall receive a dollar for dollar credit against the $8 million agreed judgment for all settlement payments made (including the initial $3.4 million payment) if the judgment is ever filed for nonpayment. If all of the payments called for in Section 1 are made, all copies of the judgment in the possession of Taylor, Espinosa or counsel for Espinosa, including the original copy signed by the Court, will be delivered to counsel for the

-2-

2024

James Parties and Beste. At such time, the James Parties and/or Beste will be permitted to destroy any and all copies of the judgment. The parties also agree to the agreed order of severance attached hereto as Exhibit B. That order of severance will be filed immediately upon approval of the settlement by the trial court judge so that the agreed judgment can be filed in that cause, if appropriate under the terms of this Agreement.

3. <u>Permanent Injunction</u>: The James Parties and Beste agree to the entry of the Permanent Injunction attached hereto as Exhibit C.

4. <u>Agreement to Cooperate</u>: If the James Parties discover any additional non-privileged records and/or documents that relate to RV and/or HCF that have not already been produced in this litigation, they agree to provide a copy to their counsel who will then provide a copy to counsel for the Receiver and the James Parties agree to maintain a copy of those records and/or documents until January 1, 2014. The James Parties agree to respond to written questions or inquiries from Espinosa or Taylor related to policy maturity issues and/or problems either of them may have from time to time related to management or administration of the policies. The written questions or inquires described above are to be transmitted to the James Parties through their counsel of record. Espinosa, Taylor, and counsel for Espinosa and/or Taylor are not to contact the James Parties without prior permission from their respective counsel of record. If Espinosa, Taylor, and counsel for Espinosa and/or Taylor are unable, after a good faith search, to locate Larry York, Carl Galant, or Nicholas Laurent to submit a written inquiry as provided herein, they may contact the James Parties directly in writing. In response to a direct inquiry from Espinosa or Taylor, the James Parties may refer Espinosa and/or Taylor to counsel for the James Parties in which case all further communications will be through counsel.

5. <u>Releases</u>.

A. In return for the Monetary Consideration to be paid as stated herein, the Agreement to Cooperate, the James Parties' and Beste's releases, as set forth below, and other good and valuable consideration, Plaintiffs, for themselves and their respective legal representatives, successors, and assigns hereby agree to mutually, irrevocably, unconditionally and completely, RELEASE, ACQUIT AND FOREVER DISCHARGE the James Parties and Beste and all of their agents, employees, servants and attorneys, of and from any and all claims, demands, actions, debts, accounts, rights, liabilities, damages, judgments, liens, losses, costs, expenses, attorneys' fees and causes of action of any nature, both past, present and future, known and unknown, accrued and unaccrued, foreseen and unforeseen, asserted and not asserted, discovered or not discovered, whether at law, in equity or otherwise, either direct or consequential, which Plaintiffs could have or have ever had or may now have against the James Parties and Beste that were brought and/or that could have been brought in Cause No. D-1-GV-10-000454, and that arise out of all operations and activities of RV or HCF, against each other and all of their respective counsel, agents, etc. with prejudice. Plaintiffs' release is expressly conditioned upon the payment of the

- 3 -

Monetary Consideration as required by Section 1 hereof.

B.  In return for Plaintiffs' release, as set forth in Section 5.A hereof, and other good and valuable consideration, the James Parties and Beste, for themselves and their respective heirs, executors, administrators, legal representatives, successors and assigns, hereby agree to mutually, irrevocably, unconditionally and completely, RELEASE, ACQUIT AND FOREVER DISCHARGE Plaintiffs, the State of Texas, Eduardo S. Espinosa, individually, Janet Mortenson, individually, Michael D. Napoli, John Thomas, John M. McConnell, Jim George, Cox Smith Matthews, Incorporated, K&L Gates, LLP, George & Brothers, LLP, George, Brothers, Kincaid & Horton, LLP, Donald R. Taylor, individually, Isabelle M. Antongiorgi, and Taylor Dunham LLP, and all of their agents, employees, servants and attorneys of and from any and all claims, demands, actions, debts, accounts, rights, liabilities, damages, judgments, liens, losses, costs, expenses, attorneys' fees and causes of action of any nature, both past, present and future, known and unknown, accrued and unaccrued, foreseen and unforeseen, asserted and not asserted, discovered or not discovered, whether at law, in equity or otherwise, either direct or consequential, which the James Parties and Beste could have or have ever had or may now have against Plaintiffs that were brought and/or that could have been brought in Cause No. D-1-GV-10-000454, and that arise out of all operations and activities of RV or HCF, against each other and all of their respective counsel, agents, etc. with prejudice. The James Parties' and Beste's release is expressly conditioned upon the Plaintiffs' mutual release contained in Section 5.A hereof.

C.  The parties expressly waive the provisions of any law that might otherwise render the releases contained herein unenforceable with respect to unknown claims, including § 1542 of the California Civil Code, which provides as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

D.  Plaintiffs, the James Parties and Beste completely and unconditionally release and forever discharge each other, respectively, from any claim that this Agreement was induced by any fraudulent or negligent act or omission, and/or result from any actual or constructive fraud, negligent misrepresentation, conspiracy, breach of fiduciary duty, breach of confidential relationship, or the breach of any other duty under law or in equity. It is the Plaintiffs' and the James Parties' and Beste's intent that on and following the execution of this Agreement that they shall have no further relationship with each other, other than rights that are expressly created in this Agreement. Plaintiffs, the James Parties and Beste expressly understand and agree that the exchange of releases does not apply to actions brought by any of them to enforce the terms of this Agreement. The James Parties and Beste further understand and agree that the foregoing no-further-relationship clause

-4-

2026

shall not apply to the State of Texas or its agencies, except insofar as the claim, demand, action, debt, account, right, liability, damage, judgment, lien, loss, cost, expense, claim for attorneys' fees or cause of action has been released under Section 5 of this Agreement. Plaintiffs, the James Parties and Beste shall reserve and each has reserved all of their rights against the other to enforce the terms of this Agreement.

E. Nothing in this release language nor any other provision of this Agreement is intended to release any claims Plaintiffs have against the Licensees, Wells Fargo or any other party to the Lawsuit. Those claims are expressly and specifically reserved. Except as expressly provided herein, there are no third party beneficiaries to this Agreement.

6. Non-Admission. . Plaintiffs, the James Parties and Beste agree that this Agreement is a compromise settlement of a disputed claim or claims, and shall not be deemed or construed at any time or for any purpose to be an admission by any released party of any violation of any right, contract, statute, or common law or of any wrongdoing. The James Parties and Beste vigorously dispute all claims that have been asserted against them and maintain that those claims have no basis in fact or law.

7. Defense And Indemnity. Plaintiffs further agree to DEFEND, INDEMNIFY AND HOLD HARMLESS the James Parties and Beste from any claim or cause of action of any kind filed or made against any of them which has been or may subsequently be brought by, through, or on behalf of Plaintiffs and arising from any claim released under this Agreement. The James Parties and Beste, likewise, agree to DEFEND, INDEMNIFY AND HOLD HARMLESS the Plaintiffs from any claim or cause of action of any kind hereafter filed or made against any of them which has been or may subsequently be brought by, through, or on behalf of the James Parties and Beste and arising from any claim released under this Agreement. This right of indemnity is conditioned upon prompt notice by the party claiming a right to indemnity on any such claim to the party against whom indemnity is sought and the party against whom indemnity is sought being given the right to defend the claim on which indemnity is sought. Plaintiffs, the James Parties and Beste warrant they are not presently aware of any facts that would give rise to a claim for indemnity under this Section. The right to indemnity in this Section is limited to the James Parties, Beste and Plaintiffs, as herein defined, and shall not be construed as granting a right to indemnity in favor of any other entities or persons related to or affiliated with the Plaintiffs or the James Parties and Beste. The parties' indemnity obligation under this provision is limited to the Monetary Consideration actually paid by the James Parties and Beste pursuant to Section 1 above. The Defense and Indemnity provisions set out in this Section 7 shall not apply to the State of Texas or its agencies; provided, however, that the absence of such obligation on the part of the State shall in no way limit or modify the scope the release given by the State of Texas in Section 5. Plaintiffs' indemnity obligation does not encompass claims brought by any investors, including but not limited to the HCF Investors provided no investor claims have been or will be brought by, through, or on behalf of Plaintiffs.

-5-

2027

8.    Attorney's Fees. The James Parties, Beste and Plaintiffs will bear their own attorney's fees, expenses and costs in this Lawsuit.

9.    Reasonable Steps. The James Parties, Beste and Plaintiffs further warrant and represent that they will cooperate fully and execute any and all supplementary documents and take such additional actions which reasonably may be necessary or appropriate to give full force and effect to the terms and intent of this Agreement. RV, by and through its Receiver, and HCF, by through its Receiver, agree to file a non-suit with prejudice of all claims against the James Parties and Beste within fourteen (14) days from the date the last settlement payment is made, if all settlement payments are made as contemplated in this Agreement.

10.   Severability and Governing Law. If any single section or clause of this Agreement should be found unenforceable, it shall be severed and the remaining sections and clauses shall be enforced in accordance with the intent of this Agreement. Texas law shall govern the validity and interpretation of this Agreement.

11.   Waiver or Breach. The James Parties, Beste and Plaintiffs agree that one or more waivers or breaches of any covenant, term, or provision of this Agreement by any party shall not be construed as a waiver of a subsequent breach of the same covenant, term, or provision, or as a waiver or breach of any other covenant, term, or provision.

12.   Entire Agreement. This Agreement, including the exhibits hereto, contains the entire understanding between the James Parties, Beste and Plaintiffs and supersedes all prior agreements and understandings, oral or written, relating to the subject matter of this Agreement. The James Parties, Beste and Plaintiffs expressly acknowledge and agree that no provisions, representations, or warranties whatsoever were made, express or implied, other than those contained in this Agreement and that they are not relying on any statement or communication from the other party other than those expressly contained in this Agreement in deciding to execute this Agreement. This Agreement shall not be modified, amended, or terminated unless such modification, amendment, or termination is executed in writing and signed by authorized representatives of the affected parties. The James Parties, Beste and Plaintiffs hereby waive their right to make future oral agreements covering the same subject as this Agreement.

13.   Construction. The language of all parts of this Agreement shall in all cases be construed as a whole, according to its fair meaning, and not strictly for or against either the James Parties, Beste or Plaintiffs. The James Parties, Beste and Plaintiffs agree that the waivers, releases, relinquishments and disavowals herein granted shall be with respect to claims, interests, rights, remedies and causes of action known or unknown, matured or unmatured, contingent or direct, existing or hereafter arising. The James Parties, Beste and Plaintiffs acknowledge (after full consideration of the consequences and after being fully advised in the premises) that the waiver and relinquishment of their respective claims contained in this Agreement is full and complete, whether or not the factual basis for their respective claims or defenses are currently known to them.

- 6 -

2028

14. **Other Acknowledgments.** Plaintiffs, the James Parties and Beste, and each of them, hereby represent and certify that they (1) have had an opportunity to read all of this Agreement; (2) have been given a fair opportunity to, and have been advised to, discuss and negotiate the terms of this Agreement by and through their legal counsel; (3) have been given a reasonable time to consider the Agreement; (4) understand the provisions of this Agreement; (5) have had ample opportunity to seek and have received advice from an attorney or other advisors regarding this Agreement or have otherwise waived their right to do so; (6) have determined that it is in their best interest to enter into this Agreement; (7) have not been influenced to sign this Agreement by any statement or representation by the other party or its legal counsel or other representative not contained in this Agreement; (8) have had sufficient time to investigate the existence of the claims and other rights hereby released and have satisfied themselves with respect to the same based upon their investigation and the advice of counsel, (9) are fully authorized to execute this Agreement in the capacities in which it is executed and (10) enter into this Agreement knowingly and voluntarily without coercion, duress, or fraud.

15. **Valid Consideration.** Plaintiffs, the James Parties and Beste agree that this Agreement is supported by good, valuable, and sufficient consideration.

16. **Change of Facts.** Plaintiffs, the James Parties and Beste understand and agree that the facts in respect of which this Agreement is made may hereafter prove to be other than, or of different form than, the facts now known by either of them or believed by either of them to be true as set forth in this Agreement. Plaintiffs, the James Parties and Beste expressly accept and assume the risk of the facts proving to be so different, and each of them agrees that all of the terms of this Agreement shall be, in all respects, effective and binding, and not subject to termination or rescission by either of them due to any such difference in facts.

17. **Multiple Counterparts.** Plaintiffs, the James Parties and Beste agree that this Agreement may be signed in multiple counterparts, each of which shall be deemed an original for all purposes.

Plaintiffs the James Parties and Beste have executed this Agreement on the following date

**Remainder of this Page Intentionally Left Blank**

-7-

2029

Date: _April 22, 2013_          _Eduardo S Espinosa_
                               Eduardo S. Espinosa in his capacity as Receiver of
                               Retirement Value, LLC and on behalf of Retirement
                               Value, LLC

THE STATE OF TEXAS      §
                        §
COUNTY OF DALLAS        §

     BEFORE ME, the undersigned authority, on this day personally appeared Eduardo S. Espinosa known to me to be the person whose name is subscribed to the foregoing "Settlement Agreement and Release of all Claims" and acknowledged to me that he executed same for the purposes and considerations therein expressed and in the capacity or capacities indicated.

     GIVEN UNDER MY HAND AND SEAL OF OFFICE this 22nd day of April _____ 2013.

                               _Cynthia Taylor_
                               Notary Public, the State of Texas

CYNTHIA TAYLOR
Notary Public, State of Texas
My Commission expires
March 22, 2017

- 3 -

2030

Date: 4/22/2013

_____
Donald Taylor in his capacity as Receiver of
Hill Country Funding (Texas), LLC and
Hill Country Funding (Nevada), LLC and on
behalf of Hill Country Funding (Texas), LLC and
Hill Country Funding (Nevada), LLC

THE STATE OF TEXAS § 
§
COUNTY OF TRAVIS § 

BEFORE ME, the undersigned authority, on this day personally appeared Donald Taylor known to me to be the person whose name is subscribed to the foregoing "Settlement Agreement and Release of all Claims" and acknowledged to me that he executed same for the purposes and considerations therein expressed and in the capacity or capacities indicated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 22ⁿᵈ day of April 2013.

_____
Notary Public, the State of Texas

-9-

2031

Date: _April 22, 2013_  _Janet Mortenson, Special Receiver_

Janet Mortenson in her capacity as Special Receiver
of Retirement Value, LLC

THE STATE OF TEXAS §
§
COUNTY OF HARRIS §

BEFORE ME, the undersigned authority, on this day personally appeared Janet
Mortenson known to me to be the person whose name is subscribed to the foregoing "Settlement
Agreement and Release of all Claims" and acknowledged to me that she executed same for the
purposes and considerations therein expressed and in the capacity or capacities indicated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _22nd_ day of
_April_ 2013.

_Linda Smith_

Notary Public, the State of Texas

LINDA SMITH
Notary Public
STATE OF TEXAS
My Comm. Exp. 10-28-15

- 10 -

2032

Date: 4-22-2013     Jack Hohengarten
                    Assistant Attorney General
                    On behalf of the State of Texas

THE STATE OF TEXAS     §
                       §
COUNTY OF TRAVIS       §

BEFORE ME, the undersigned authority, on this day personally appeared Jack Hohengarten known to me to be the person whose name is subscribed to the foregoing "Settlement Agreement and Release of all Claims" and acknowledged to me that she executed same for the purposes and considerations therein expressed and in the capacity or capacities indicated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 22nd day of April 2013.

JERRY McCOY-GOLAN
Notary Public
STATE OF TEXAS
Commission Exp. 11-17-2015

Notary without Bond

Notary Public the State of Texas

- 11 -

2033

Date: 4-18-2013

James Settlement Services, LLC
By: Ronald James
Its: Managing Member

THE STATE OF CALIFORNIA §
§
COUNTY OF CONTRA COSTA §

BEFORE ME, the undersigned authority, on this day personally appeared Ronald James, the Managing Member of James Settlement Services, LLC, known to me to be the person whose name is subscribed to the foregoing "Settlement Agreement and Release of all Claims" and acknowledged to me that he executed same for the purposes and considerations therein expressed and in the capacity or capacities indicated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 18 day of APRIL 2013.

Notary Public, the State of California

KAZIE K. AFSARI
Comm. #1903175
Notary Public · California
Contra Costa County
Comm. Expires Sep 6, 2014

- 12 -

2034

Date: 4-18-2013

Ronald James, individually

THE STATE OF CALIFORNIA §
                         §
COUNTY OF CONTRA COSTA §

BEFORE ME, the undersigned authority, on this day personally appeared Ronald James, known to me to be the person whose name is subscribed to the foregoing "Settlement Agreement and Release of all Claims" and acknowledged to me that he executed same for the purposes and considerations therein expressed and in the capacity or capacities indicated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 18 day of APRIL 2013.

Notary Public, the State of California

KAZIE K. AFSARI
Comm. #1903175
Notary Public • California
Contra Costa County
Comm. Expires Sep 6, 2014

- 13 -

2035

Date: 4/18/2012 _____
(Donald James)

THE STATE OF CALIFORNIA §
                       §
COUNTY OF CONTRA COSTA §

BEFORE ME, the undersigned authority, on this day personally appeared Donald James known to me to be the person whose name is subscribed to the foregoing "Settlement Agreement and Release of all Claims" and acknowledged to me that he executed same for the purposes and considerations therein expressed and in the capacity or capacities indicated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 18 day of APRiL 2013.

KAZIE K. AFSARI
Comm. #1903175
Notary Public · California
Contra Costa County
Comm. Expires Sep 6, 2014

_____
Notary Public, the State of California

- 14 -

2036

Date: 4/19/2013

_Michael Beste_
Michael Beste

**THE STATE OF NEW MEXICO** §
                              §
**COUNTY OF SANTA FE** §

BEFORE ME, the undersigned authority, on this day personally appeared Michael Beste known to me to be the person whose name is subscribed to the foregoing "Settlement Agreement and Release of all Claims" and acknowledged to me that he executed same for the purposes and considerations therein expressed and in the capacity or capacities indicated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _19TH_ day of _April_ 2013.

OFFICIAL SEAL
**Linda J. Miller**
NOTARY PUBLIC
STATE OF NEW MEXICO
My Commission Expires: 06/25/2016

_Linda J. Miller_
Notary Public, the State of New Mexico

2037

Filed
13 November 14 A10:43
Amalla Rodriguez-Mendoza
District Clerk
Travls District
D-1-GV-10-000454

CAUSE NO. D-1-GV-10-000454

| | | |
|---|---|---|
| STATE OF TEXAS,<br>　　　*Plaintiff*, | § § § | IN THE DISTRICT COURT OF |
| v. | § § | |
| RETIREMENT VALUE, LLC,<br>*ET AL.*,<br>　　　*Defendants*, | § § § § | TRAVIS COUNTY, TEXAS |
| AND | § § | |
| JAMES SETTLEMENT SERVICES, LLC,<br>*ET AL.*<br>　　　*Third-Party Defendants* | § § § § | 126TH JUDICIAL DISTRICT |

## STIPULATION AS TO COMMISSIONS RECEIVED BY CERTAIN LICENSEES POE, PECHACEK, CORNETT AND CHICK

The Receiver and counsel for Third-Party Defendants/Licensees James Poe, Damien Pechacek, Shawn Cornett and Greg Chick (individually and collectively "Licensees") stipulate that Licensees received the following sums as commission payments from Retirement Value. This is a stipulation as the sums the respective Licensees received but is not a stipulation that these sums are recoverable as damages under the TUFTA theory of recovery asserted by the Receiver upon which the Court has indicated she will grant summary judgment or under any other theory of recovery asserted by the Receiver. The Receiver and the Licensees further stipulate that by entering into this stipulation, the Licensees in no way waive any argument on appeal concerning the Receiver's Motion for Summary Judgment against the Licensees, including, but not limited to, the argument that Licensees are not liable to the Receiver or RV for any amount of damages and that the Receiver has not proven as a matter of law that the amount received is the amount of damages recoverable by the Receiver under the TUFTA theory of recovery. Finally, the Licensees do not stipulate that they received the sums below in

1

1966

addition to the sums received by the entities they owned that were also Licensees, for example,

Senior Retirement Planners for James Poe, Niche Investment Group and PC&S for Shawn

Cornett and Damien Pechacek and Alternative Solutions Insurance Services for Greg Chick

(except for $5,000).

1. James Poe $485,564.13,
2. Damien Pechacek $118,802.65,
3. Shawn Cornett $118,802.65, and
4. Greg Chick $38,815.50.

Date: November 7, 2013

STIPULATED:

John W. Thomas
State Bar No. 19856425
GEORGE, BROTHERS, KINCAID & HORTON LLP
114 W Seventh, Suite 1100
Austin, TX 78701-3015
Telephone: (512) 495-1400
Facsimile: (512) 499-0094

ATTORNEYS FOR RECEIVER

Robert L. Wright
State Bar No. 22054300
ROBERT L. WRIGHT, P.C.
612 Eighth Avenue
Fort Worth, Texas 76104
Telephone: (817) 850-0082
Facsimile: (817) 870-9101

ATTORNEYS FOR THIRD-PARTY DEFENDANTS
JAMES POE, DAMIEN PECHACEK, SHAWN
CORNETT AND GREG CHICK

2

1967

*Texas* Statutes and Codes > BUSINESS AND COMMERCE CODE > *TITLE 3. INSOLVENCY, FRAUDULENT TRANSFERS, AND FRAUD* > *CHAPTER 24. UNIFORM FRAUDULENT TRANSFER ACT*

## § 24.005. Transfers Fraudulent As to Present and Future Creditors

(a)  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

   (1)  with actual intent to hinder, delay, or defraud any creditor of the debtor; or

   (2)  without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

      (A)  was engaged or was about to engage in a *business* or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the *business* or transaction; or

      (B)  intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(b)  In determining actual intent under Subsection (a)(1) of this section, consideration may be given, among other factors, to whether:

   (1)  the transfer or obligation was to an insider;

   (2)  the debtor retained possession or control of the property transferred after the transfer;

   (3)  the transfer or obligation was concealed;

   (4)  before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

   (5)  the transfer was of substantially all the debtor's assets;

   (6)  the debtor absconded;

   (7)  the debtor removed or concealed assets;

   (8)  the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

   (9)  the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

   (10)  the transfer occurred shortly before or shortly after a substantial debt was incurred; and

   (11)  the debtor transferred the essential assets of the *business* to a lienor who transferred the assets to an insider of the debtor.

## History

Enacted by *Acts 1987, 70th Leg., ch. 1004 (H.B. 2193)*, § 1, effective September 1, 1987; am. *Acts 1993, 73rd Leg., ch. 570 (H.B. 1113)*, § 10, effective September 1, 1993.

**Annotations**

## Case Notes

Bankruptcy Law: Case Administration: Examiners, Officers & Trustees: Fraudulent Transfers: General Overview
Bankruptcy Law: Case Administration: Examiners, Officers & Trustees: Fraudulent Transfers: Constructively Fraudulent

*Texas* Statutes and Codes > *BUSINESS* AND COMMERCE CODE > *TITLE 3. INSOLVENCY, FRAUDULENT TRANSFERS, AND FRAUD* > *CHAPTER 24. UNIFORM FRAUDULENT TRANSFER ACT*

## § *24.006*. Transfers Fraudulent As to Present Creditors

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

## History

Enacted by *Acts 1987, 70th Leg., ch. 1004 (H.B. 2193)*, *§ 1, effective September 1, 1987.*

**Annotations**

## Case Notes

Administrative Law: Separation of Powers: Legislative Controls: General Overview
Bankruptcy Law: Case Administration: Examiners, Officers & Trustees: Fraudulent Transfers: General Overview
Bankruptcy Law: Case Administration: Examiners, Officers & Trustees: Fraudulent Transfers: Constructively Fraudulent Transfers
Bankruptcy Law: Case Administration: Examiners, Officers & Trustees: Fraudulent Transfers: Elements
Bankruptcy Law: Case Administration: Examiners, Officers & Trustees: Fraudulent Transfers: Value
Bankruptcy Law: Case Administration: Examiners, Officers & Trustees: Preferential Transfers: General Overview
Bankruptcy Law: Case Administration: Examiners, Officers & Trustees: Transferee Liability
Bankruptcy Law: Case Administration: Examiners, Officers & Trustees: Voidable Transfers: General Overview
Bankruptcy Law: Case Administration: Examiners, Officers & Trustees: Voidable Transfers: Unsecured Creditors
Bankruptcy Law: Claims: Allowance
Bankruptcy Law: Practice & Proceedings: Adversary Proceedings: Defenses, Motions for Judgment & Objections
Bankruptcy Law: State Insolvency Laws
*Business* & Corporate Law: Corporations: Dissolution & Receivership: Receiverships: Causes of Action & Remedies
*Business* & Corporate Law: Corporations: Shareholders: Disregard of Corporate Entity: Alter Ego: General Overview
Civil Procedure: Removal: Basis: Diversity of Citizenship
Civil Procedure: Removal: Proceedings: Fraudulent Joinder
Civil Procedure: Judgments: Entry of Judgments: Enforcement & Execution: Fraudulent Transfers
Civil Procedure: Remedies: Costs & Attorney Fees: Attorney Expenses & Fees: Statutory Awards
Civil Procedure: Remedies: Damages: Punitive Damages
Commercial Law (UCC): Secured Transactions (Article 9): Security Agreements: General Overview
Constitutional Law: Supremacy Clause: Federal Preemption
Criminal Law & Procedure: Sentencing: Forfeitures: Defenses
Estate, Gift & Trust Law: Community Property: General Overview
Governments: Legislation: Statutes of Limitations: Governmental Entities
Insurance Law: Life Insurance: Beneficiaries: General Overview
Insurance Law: Life Insurance: Beneficiaries: Vested Rights
Mergers & Acquisitions Law: Fraudulent Transfers

## Tex. Bus. & Com. Code § 24.002

This document is current through the 2013 3rd Called Session

*Texas* Statutes and Codes  >  *BUSINESS* AND COMMERCE CODE  >  *TITLE 3. INSOLVENCY,*
*FRAUDULENT TRANSFERS, AND FRAUD*  >  *CHAPTER 24. UNIFORM FRAUDULENT*
*TRANSFER ACT*

# § 24.002. Definitions

In this chapter:

(1) "Affiliate" means:

    (A) a person who directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than a person who holds the securities:

        (i) as a fiduciary or agent without sole discretionary power to vote the securities; or

        (ii) solely to secure a debt, if the person has not exercised the power to vote;

    (B) a corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor or a person who directly or indirectly owns, controls, or holds, with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than a person who holds the securities:

        (i) as a fiduciary or agent without sole power to vote the securities; or

        (ii) solely to secure a debt, if the person has not in fact exercised the power to vote;

    (C) a person whose *business* is operated by the debtor under a lease or other agreement, or a person substantially all of whose assets are controlled by the debtor; or

    (D) a person who operates the debtor's *business* under a lease or other agreement or controls substantially all of the debtor's assets.

(2) "Asset" means property of a debtor, but the term does not include:

    (A) property to the extent it is encumbered by a valid lien;

    (B) property to the extent it is generally exempt under nonbankruptcy law; or

    (C) an interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant, under the law of another jurisdiction.

(3) "Claim" means a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

(4) "Creditor" means a person, including a spouse, minor, person entitled to receive court or administratively ordered child support for the benefit of a child, or ward, who has a claim.

(5) "Debt" means a liability on a claim.

(6) "Debtor" means a person who is liable on a claim.

(7) "Insider" includes:

    (A) if the debtor is an individual:

        (i) a relative of the debtor or of a general partner of the debtor;

        (ii) a partnership in which the debtor is a general partner;

        (iii) a general partner in a partnership described in Subparagraph (ii) of this paragraph; or

        (iv) a corporation of which the debtor is a director, officer, or person in control;

    **(B)** if the debtor is a corporation:

        **(i)** a director of the debtor;

        **(ii)** an officer of the debtor;

        **(iii)** a person in control of the debtor;

        **(iv)** a partnership in which the debtor is a general partner;

        **(v)** a general partner in a partnership described in Subparagraph (iv) of this paragraph; or

        **(vi)** a relative of a general partner, director, officer, or person in control of the debtor;

    **(C)** if the debtor is a partnership:

        **(i)** a general partner in the debtor;

        **(ii)** a relative of a general partner in, a general partner of, or a person in control of the debtor;

        **(iii)** another partnership in which the debtor is a general partner;

        **(iv)** a general partner in a partnership described in Subparagraph (iii) of this paragraph; or

        **(v)** a person in control of the debtor;

    **(D)** an affiliate, or an insider of an affiliate as if the affiliate were the debtor; and

    **(E)** a managing agent of the debtor.

**(8)** "Lien" means a charge against or an interest in property to secure payment of a debt or performance of an obligation, and includes a security interest created by agreement, a judicial lien obtained by legal or equitable process or proceedings, a common-law lien, or a statutory lien.

**(9)** "Person" means an individual, partnership, corporation, association, organization, government or governmental subdivision or agency, *business* trust, estate, trust, or any other legal or commercial entity.

**(10)** "Property" means anything that may be the subject of ownership.

**(11)** "Relative" means an individual related by consanguinity within the third degree as determined by the common law, a spouse, or an individual related to a spouse within the third degree as so determined, and includes an individual in an adoptive relationship within the third degree.

**(12)** "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance. The term does not include a transfer under a disclaimer filed under Section 37A, *Texas* Probate Code, or *Section 112.010, Property Code*.

**(13)** "Valid lien" means a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings.

# History

Enacted by *Acts 1987, 70th Leg., ch. 1004 (H.B. 2193)*, § 1, *effective September 1, 1987; am. Acts 1993, 73rd Leg., ch. 846 (H.B. 1200)*, § 2, *effective September 1, 1993; am. Acts 1997, 75th Leg., ch. 911 (S.B. 29)*, § 95, *effective September 1, 1997.*

**Annotations**

# Case Notes

Bankruptcy Law: Case Administration: Examiners, Officers & Trustees: Fraudulent Transfers: General Overview
Bankruptcy Law: Case Administration: Examiners, Officers & Trustees: Fraudulent Transfers: Elements

Texas Statutes and Codes  >  BUSINESS AND COMMERCE CODE  >  TITLE 3. INSOLVENCY, FRAUDULENT TRANSFERS, AND FRAUD  >  CHAPTER 24. UNIFORM FRAUDULENT TRANSFER ACT

# § 24.003. Insolvency

(a)  A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.

(b)  A debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent.

(c)  [Repealed by Acts 2013, 83rd Leg., ch. 9 (S.B. 847), § 11, effective September 1, 2013.]

(d)  Assets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under this chapter.

(e)  Debts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset.

## History

Enacted by Acts 1987, 70th Leg., ch. 1004 (H.B. 2193), § 1, effective September 1, 1987; am. Acts 1993, 73rd Leg., ch. 570 (H.B. 1113), § 8, effective September 1, 1993; am. Acts 2013, 83rd Leg., ch. 9 (S.B. 847), § 11, effective September 1, 2013.

**Annotations**

## Notes

2013 amendment,

repealed (c), which read: "A partnership is insolvent under Subsection (a) of this section if the sum of the partnership's debts is greater than the aggregate, at a fair valuation, of all of the partnership's assets and the sum of the excess of the value of each general partner's nonpartnership assets over the partner's nonpartnership debts."

## Case Notes

Administrative Law: Separation of Powers: Legislative Controls: General Overview
Bankruptcy Law: Case Administration: Examiners, Officers & Trustees: Fraudulent Transfers: General Overview
Bankruptcy Law: Case Administration: Examiners, Officers & Trustees: Fraudulent Transfers: Constructively Fraudulent Transfers
Bankruptcy Law: Case Administration: Examiners, Officers & Trustees: Voidable Transfers: Unsecured Creditors
Business & Corporate Law: Corporations: Dissolution & Receivership: Receiverships: Causes of Action & Remedies
Civil Procedure: Judgments: Entry of Judgments: Enforcement & Execution: Fraudulent Transfers
Real Property Law: Purchase & Sale: Fraudulent Transfers

**LexisNexis (R) Notes**

**Administrative Law: Separation of Powers: Legislative Controls: General Overview**
**1.** Trial court found, as supported in the record, that during the pendency of the litigation, one or more of the principals of the development company transferred an asset, worth at least $3,500,000 to the stockholder individually, and that the

*Texas* Statutes and Codes   >   *BUSINESS AND COMMERCE CODE*   >   *TITLE 3. INSOLVENCY,*
*FRAUDULENT TRANSFERS, AND FRAUD*   >   *CHAPTER 24. UNIFORM FRAUDULENT*
*TRANSFER ACT*

## § 24.004. Value

(a) Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's *business* to furnish support to the debtor or another person.

(b) For the purposes of Sections 24.005(a)(2) and *24.006* of this code, a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or execution of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust, or security agreement.

(c) A transfer is made for present value if the exchange between the debtor and the transferee is intended by them to be contemporaneous and is in fact substantially contemporaneous.

(d) "Reasonably equivalent value" includes without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction.

## History

Enacted by *Acts 1987, 70th Leg., ch. 1004 (H.B. 2193)*, § 1, *effective September 1, 1987; am. Acts 1993, 73rd Leg., ch. 570 (H.B. 1113)*, § 9, *effective September 1, 1993.*

**Annotations**

## Case Notes

Bankruptcy Law: Case Administration: Examiners, Officers & Trustees: Fraudulent Transfers: Value
Civil Procedure: Judgments: Entry of Judgments: Enforcement & Execution: Fraudulent Transfers
Commercial Law (UCC): Secured Transactions (Article 9): Security Agreements: General Overview
Evidence: Testimony: Credibility: General Overview
Real Property Law: Purchase & Sale: Fraudulent Transfers
Torts: *Business* Torts: Fraud & Misrepresentation: General Overview

**LexisNexis (R) Notes**

**Bankruptcy Law: Case Administration: Examiners, Officers & Trustees: Fraudulent Transfers: Value**
1. Debtor's interest in negotiable instruments could be converted when it failed to receive payments, under *Tex. Bus. & Com.* Code § 3.420(a). The debtor's claim for fraudulent transfer under *Tex. Bus. & Com.* Code, § 24.005(a)(2), because the debtor received reasonably equivalent value at the time of transfers. *Smith v. Woodforest Nat'l Bank (In re IFS Fin. Corp.), 2007 Bankr. LEXIS 4708 (Bankr. S.D. Tex. May 3 2007).*

**Civil Procedure: Judgments: Entry of Judgments: Enforcement & Execution: Fraudulent Transfers**
2. After finding transfers of stock fraudulent, the trial court erred by limiting the creditor's relief to execution on the stock and denying a money judgment. Absent evidence that the stock had been issued before it was fraudulently transferred, the record did not support the trial court's conclusions of law that the creditor had an opportunity to levy execution on the stock before it declined in value. *Altus Brands Ii, Llc v. Alexander, 2014 Tex. App. LEXIS 6554 (Tex. App.--Dallas June 17, 2014).*
3. Where a guarantor fraudulently transferred interest in his *business*' to an insider limited liability company (LLP), who